928 A.2d 1025

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Bernard COUSAR, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2006.

Decided Aug. 21, 2007.

208

210

David B. Mischak, Philadelphia, for Bernard Cousar.

Amy Zapp, Regina Oberholzer, Harrisburg, Hugh J. Burns, Jr., Philadelphia District Attorney's Office, for Com.

BEFORE: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER, BALDWIN, JJ.

## *OPINION*

Justice SAYLOR.

This is a capital direct appeal from judgments of sentence imposed by the Philadelphia Court of Common Pleas on May 11, 2001, and January 4, 2002.

On April 5, 1999, Appellant shot and killed Luis Santos on a street corner at point-blank range, and stole a gold chain necklace from around Santos's neck. Three weeks later, on April 26, 1999, Appellant was seen arguing with William Townes as Appellant stood on a street corner and Townes sat in his vehicle. Appellant drew a gun and shot Townes three times at close range, killing him. Thereafter, on May 6, 1999, Appellant, together with three compatriots, forcibly entered Frank Schoenberger's home, robbed and beat him at gunpoint, and fled when the police arrived. An officer apprehended Appellant as he was running from the scene. The following day, Schoenberger discovered that the intruders had left a handgun inside his home. Police firearms experts identified the gun as the weapon used to kill Santos and Townes. All

three incidents took place within several blocks of Appellant's place of residence in the Hunting Park section of Philadelphia.

Appellant was charged by three separate bills of information with, *inter alia*, two counts of criminal homicide (as to Santos and Townes) and two counts of robbery (as to Santos and Schoenberger). The Commonwealth pursued trial of all of the offenses on a consolidated basis, which the trial court permitted over Appellant's objection. Appellant proceeded to trial before a jury, which took place from May 2–11, 2001.

In its case concerning the Santos killing, the Commonwealth presented the testimony of four eyewitnesses to the shooting, which occurred at approximately ten o'clock a.m. on a clear, sunny day. As these witnesses described the events, Santos pulled up and parked his car along the street to use an outdoor payphone, leaving his two-year-old son in the automobile nearby. As Santos returned to his vehicle, Appellant approached him and began speaking with him. From the gestures of the two individuals, it appeared that Appellant was demanding the thick gold chain Santos was wearing around his neck, but Santos was refusing to comply. As Santos turned toward his car, Appellant shot him once in the back, and then grabbed and pocketed the gold chain as Santos fell. Appellant then calmly walked away from the scene, leaving Santos mortally wounded on the pavement. According to the medical examiner, the single bullet pierced Santos's spinal cord, lungs, and aorta, causing his death.

All of the eyewitnesses to the shooting positively identified Appellant in court as the shooter, and each also stated that the black, "puffy" down jacket that the police retrieved from Appellant at the time of his arrest matched the coat that the individual who shot Santos was wearing. Additionally, one of these witnesses, Ms. Diaz, testified that she recognized Appellant at the time of the shooting because she knew him and his family from the neighborhood. Several weeks after the incident, she positively identified Appellant as the shooter from a police photographic array. Another eyewitness, Ms. Carrasquillo, also selected Appellant from a photographic array a few weeks after the incident. She, too, testified that she recog-

nized Appellant at the time of the shooting because she had previously seen him in the neighborhood. Ms. Khabir, on the other hand, failed to select Appellant from a police lineup conducted on June 16, 1999, but she did make a positive identification in court the following day at the preliminary hearing, a fact that was relayed to the jury.[1] Finally, the fourth eyewitness, Mr. Abdu, saw the shooting from approximately twelve feet away as he was in his car stopped at a traffic light. He then reported the matter to the police over his cell phone as he followed the shooter in his car while the latter walked away from the scene. Mr. Abdu continued his pursuit until the shooter entered a row house on the 3900 block of North Percy Street. Although he could not tell exactly which row house the assailant went into, the location he provided to the police was the approximate site of Appellant's known place of residence. Mr. Abdu, who testified that he got a good look at the shooter's face at close range, also stated that he had positively identified Appellant from a police photographic array and at the preliminary hearing.

As to the matter of the killing of William Townes, a woman who sold drugs for Townes testified that, the night before the murder (that is, the night of April 25, 1999), she was robbed at gunpoint of drugs and cash belonging to Townes. Immediately after the robbery, she gave Townes a description of the individual who had robbed her, and Townes appeared to know who this was. In court, she identified Appellant as the robber, and additionally stated that he was acting in concert with another individual who was identified as Shiem Gary. This account of the April 25th incident was corroborated by another person who also saw the robbery occur and was

---

1. As for her failure to identify Appellant at the lineup, Ms. Khabir explained at trial that she suffered from claustrophobia and, because the lineup occurred in a locked detention facility from which she had no ready means of egress, she became extremely anxious and her thinking was substantially impaired. She also testified that, several hours after returning home, when she had calmed down, she visualized the lineup in her mind and became certain that the perpetrator was in the number one position. The police lineup supervisor, moreover, who never spoke with Ms. Khabir after the lineup, confirmed at trial that Appellant was indeed in the number one position.

friendly with Townes. A third witness, Ms. Redden, stated that she saw the killing of Townes the evening of April 26, 1999, as she was walking home from a store. She indicated that she was near where Townes and Appellant were arguing as Townes sat in the driver's seat of his car and Appellant stood on the street next to the vehicle; she stated that another individual was with Appellant but was not participating actively in the argument. According to Ms. Redden, Townes began to pull away, but then stopped his car at Appellant's request. Appellant then fired several shots at Townes from close range, which resulted in the car suddenly lurching forward at high speed, hitting a number of parked cars and then flipping onto its side. She stated that, immediately after the shooting, Appellant and his companion walked past her as she sat on a porch, and Appellant stated, "That's what the f—— he get." Ms. Redden identified Appellant as the shooter from a police photographic array several weeks later, and identified him in court as well. Additionally, a young woman testified that, at the time of the incident, she was sitting in the front passenger seat of Townes's car when a black male who was arguing with Townes repeatedly shot Townes at close enough range to give her gunpowder burns on her legs and face.

Townes was pronounced dead at the scene. The medical examiner stated that two of the three bullets recovered from his body pierced his lungs and aorta, causing his death.

Finally, the Commonwealth proffered evidence concerning Appellant's apprehension after he fled the scene of the Schoenberger home invasion, and the discovery of the Santos/Townes murder weapon by Mr. Schoenberger in his basement the following day. This evidence tended to show that one of Appellant's accomplices in the Schoenberger incident was Shiem Gary, the individual who had assisted Appellant in his April 25th street robbery of one of Townes's employees. Mr. Schoenberger identified Appellant in court as the leader of the group of armed intruders, and stated that he had also identified Appellant as such at the preliminary hearing one week after the crime. Additionally, at the time the police

arrived on the scene of the robbery, Appellant was wearing a coat matching the description given by witnesses to the Santos killing of the "puffy" jacket that the shooter in that matter had been wearing.[2] When the police apprehended him, they recovered from one of his pants pockets a pager that had been taken from Mr. Schoenberger's house. The police also apprehended from Appellant's co-conspirators other items of value—including cash and a gun and holster—that were stolen from the Schoenberger home during the incident.

During the Commonwealth's case, the trial court permitted it, over Appellant's objection, to adduce evidence that Appellant bore on his neck a tattoo with the letters "M.O.B." There was additional evidence, which was not challenged, that Shiem Gary had a tattoo—also with the letters "M.O.B."—on his forearm.

In his defense, Appellant called Detective William Wynn, the lineup supervisor for the Philadelphia police, who testified concerning the lineup procedure, as well as Ms. Khabir's failure to identify Appellant at a lineup on June 16, 1999 (*see supra* note 1 and associated text). Over Appellant's objection, the trial court excluded testimony from Detective Wynn regarding any other purported eyewitness to the murders who may have participated in the police lineup.[3] Appellant's mother also testified for the defense, stating that she had left Appellant at home at approximately 8:30 a.m. on the day of the Santos murder, and that when she returned later that day, he was still at home. Because she could not recall what time

**2.** Appellant was arrested twice, once on the street after the robbery, and again at his home approximately one week later after the police suspected him of homicide. (After his first arrest, Appellant was released on bail.) Each time, Appellant had the dark, "puffy" down jacket matching the one described by the witnesses to the Santos killing.

**3.** Counsel told the trial court that there were several other eyewitnesses to the Santos killing who failed to identify Appellant at the lineup, although the identity of these individuals has never been revealed at any stage in this litigation. As discussed infra, the trial court informed counsel that he could present the direct testimony of any such eyewitnesses, and, among other things, elicit testimony concerning their alleged failure to identify Appellant at the lineup. However, the defense never did this.

she returned, however, the defense conceded that her testimony did not provide an alibi but, instead, went to the weight of the identification evidence. Similarly, Appellant's sister testified that she called Appellant's residence at approximately 9:00 on the morning of the Santos shooting, and spoke to Appellant briefly. Again, however, this was insufficient to constitute an alibi, as the killing occurred at least an hour later a short distance from Appellant's house.

The jury reached verdicts on May 9, 2001, finding Appellant guilty of two counts each of first-degree murder, robbery, and possession of an instrument of crime, as well as one count each of burglary, aggravated assault, and criminal conspiracy. In the penalty phase of the trial, as to the murder of Santos, the jury found one aggravating circumstance—that Appellant committed the killing in perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6)—and no mitigating circumstances. With regard to Townes's killing, the jury found two aggravators— that Appellant had been convicted of another offense for which a sentence of life imprisonment or death was imposable, *see* 42 Pa.C.S. § 9711(d)(10), and that he had been convicted of another murder, *see* 42 Pa.C.S. § 9711(d)(11)—and no mitigators. Accordingly, by operation of law the jury returned two sentences of death. *See* 42 Pa.C.S. § 9711(c)(1)(iv).

The trial court formally imposed two death sentences on May 11, 2001, and deferred sentencing on the other convictions. Thereafter, on January 4, 2002, the court sentenced Appellant to an aggregate term of incarceration of 27 to 54 years on the remaining charges. Trial counsel was permitted to withdraw on May 23, 2001, and new counsel was appointed. Appellant's post-sentence motions and supplemental post-sentence motions were denied without a hearing on September 19, 2002.[4]

4. After Appellant filed his appeal, the common pleas court filed an opinion dated November 15, 2004, limited to the issue of evidentiary sufficiency. By *per curiam* order dated September 13, 2005, this Court granted Appellant's request to remand the matter for a more complete opinion addressing the claims he presently raises in his brief. That opinion was filed on November 22, 2005.

## Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence to support the conviction for the murder of Townes. He claims that the only eyewitness to identify him in court as the shooter, Ms. Redden, was on drugs at the time of the incident, and that her subsequent identification of Appellant from a police photographic array was equivocal because she only stated "that he 'looks like the guy' who did it." Brief for Appellant at 26. He also suggests that there was no evidence that the perpetrator specifically intended to cause the victim's death.

[1–5] To obtain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed; that the defendant did the killing; and that the killing was done in an intentional, deliberate, and premeditated manner, which this Court has construed to mean that the defendant acted with a specific intent to kill. *See* 18 Pa.C.S. §§ 2501, 2502(a); *Commonwealth v. Watkins,* 577 Pa. 194, 208–09, 843 A.2d 1203, 1211 (2003) (citing *Commonwealth v. Williams,* 537 Pa. 1, 13, 640 A.2d 1251, 1256–57 (1994); *Commonwealth v. Keaton,* 556 Pa. 442, 455, 729 A.2d 529, 536 (1999)). In reviewing whether the evidence was sufficient to support a jury's findings to this effect, this Court considers whether the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. *See Commonwealth v. Crews,* 436 Pa. 346, 348, 260 A.2d 771, 771–72 (1970). In applying this standard, we bear in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence. *See Commonwealth v. Harper,* 485 Pa. 572, 576–77, 403 A.2d 536, 538–39 (1979).

Upon review, we find the evidence adduced at trial sufficient to sustain the jury's verdict. Although Ms. Redden

did admit that she was using drugs at the time Townes was killed, she was only several feet away from Appellant as he argued with, and then shot, Townes. Also, after the killing, Ms. Redden was able to take another look at the shooter as he and his friend walked past her while she was sitting on the porch. She unequivocally identified Appellant in court as the perpetrator,[5] and additionally, her recitation of having picked Appellant from a photo array was not necessarily as equivocal as Appellant would portray it. In her direct testimony for the Commonwealth, Ms. Redden stated as follows:

Q. When they showed you the group of photographs, did you from that group of photographs recognize the person who had done the shooting?

A. Well, from all the pictures that they showed me, yes, I picked out one who I thought was the guy who-who looked like the guy that shot him. That's the picture I picked out, because I hesitated, and he said, "I see you looking at one picture." And I said, "Yeah, this guy looks like the guy who done it." So he asked me again, and I said yes.

\* \* \*

Q. I'm going to show you what's been marked as Commonwealth Exhibit 24 and ask if you recognize this as the group of photographs you were shown by Detective Baker.

A. Yes it was.

Q. And do you recall that, having been shown that group of photographs by Detective Baker and being asked, do you recognize anyone in the photo array, that you told Detective Baker Number 6, and you were asked, "What did you see this person, Number 6, do?" and your answer was, "He shot Will"?

A. Yes, it was.

Q. All right. Would you agree with me that Number 6 is a photograph of this defendant, Bernard Cousar.

A. Yes it is.

5. Ms. Redden testified that, at the time of trial, she had been drug-free for fifteen months.

Q. And is that person depicted in the photograph, that is, this defendant, the person who you saw shoot and kill Will Townes?

A. Yes, it is.

N.T. May 3, 2001, at 80–81.

■ The jury apparently believed Ms. Redden notwithstanding her drug use, and this Court is not authorized to substitute our estimation of her credibility for that of the jury. *See Commonwealth v. Gibson,* 553 Pa. 648, 664, 720 A.2d 473, 480 (1998). *See generally Commonwealth v. London,* 461 Pa. 566, 572, 337 A.2d 549, 552 (1975) ("[T]he testimony of one eyewitness, if believed, would support the finding of intentional killing."). There was also circumstantial proof supporting the jury's verdict, including the ballistics evidence showing that the gun used to kill Townes was also used to kill Santos and was left behind during the Schoenberger robbery in which Appellant participated. Finally, there was evidence that the night before the killing, Appellant robbed one of Townes's employees, and Townes was aware of the identity of the robber from the description given by the victim. When these proofs are considered in the light most favorable to the Commonwealth, a reasonable jury could find beyond a reasonable doubt that Appellant was the person who argued with, and ultimately shot, Townes.

■■ The only remaining question, then, is whether the evidence can sustain the conclusion that Appellant specifically intended to kill Townes. A specific intent to kill may be inferred from the use of a deadly weapon on a vital part of the victim's body. *See Commonwealth v. Marshall,* 534 Pa. 488, 500, 633 A.2d 1100, 1106 (1993). Here, there is no dispute that the perpetrator shot Townes three times at close range, striking vital organs. Further, the shooter was heard to utter, "That's what the f—— he get," while walking away from the scene immediately afterwards. These circumstances were sufficient to entitle the jury to find that Appellant intended to kill his victim.

■ Separately, Appellant claims that the evidence was insufficient to support his conviction of robbery and criminal

conspiracy relative to the Schoenberger incident. Although he recites the Crimes Code provisions defining the offenses of robbery and conspiracy, *see* 18 Pa.C.S. §§ 3701 (robbery), 903(a) (conspiracy), he neglects to provide any argumentation explaining why the evidence was inadequate to support the robbery conviction. Accordingly, that claim is waived. *See Commonwealth v. D'Amato*, 579 Pa. 490, 504, 856 A.2d 806, 814 (2004). Regarding the conspiracy conviction, Appellant does not specify which element(s) of the offense he believes were not proven.[6] Rather, he recites the accepted principle that one's mere presence at a crime scene "is not, in itself, sufficient to establish that one is an active partner in the intent to commit a crime." Brief for Appellant at 24 (citing, *inter alia, Commonwealth v. Fields*, 460 Pa. 316, 333 A.2d 745 (1975)). He asserts that there was little evidence that he shared with the other assailants any purpose to engage in criminal activity and that, particularly as he was unarmed at the time of his arrest, the evidence at most showed that he was merely present at the scene when the robbery occurred. *See id.* at 28.

Appellant's factual predicate is irreconcilable with the evidence presented at trial. Mr. Schoenberger testified that Appellant was the leader of the group of four individuals who forced their way into his home, *see* N.T. May 3, 2001, at 154, and stated that he had specifically identified Appellant as one of the armed intruders at the preliminary hearing one week after the crime. *See id.* at 153. He also related that he had seen Appellant together with the other three individuals inside his home in a well-lighted room while the crime was in

---

**6.** Criminal conspiracy is defined as follows:

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a).

progress. *See id.* at 116. Furthermore, a pager stolen from Schoenberger's residence was found in Appellant's pocket when Appellant was apprehended while fleeing the scene. Thus, the present case is unlike *Fields,* where, although the defendant was present at the crime scene, the Commonwealth did not adduce any proof that he had any prior knowledge of the other person's criminal intent or in any way "counseled or participated" in the offense. *Fields,* 460 Pa. at 320, 333 A.2d at 747. Here, the Commonwealth's proofs were clearly adequate to allow the jury to conclude beyond a reasonable doubt that Appellant was not an innocent bystander, but rather, an active participant in the events.

Finally, although Appellant does not forward a sufficiency challenge relative to the Santos murder, we will nevertheless conduct such a review. *See Commonwealth v. Ockenhouse,* 562 Pa. 481, 489–90, 756 A.2d 1130, 1134–35 (2000) (observing that this Court undertakes a sufficiency review in all first-degree murder cases where the death penalty is imposed). As recounted above, four separate eyewitnesses to the murder identified Appellant as the perpetrator. One of these witnesses followed the shooter until the latter entered a house on the same block and in approximately the same location where Appellant lived,[7] and, as a separate matter, the coat that Appellant was wearing when he was arrested matched the jacket that the Santos shooter wore. Further, the gun, which was fired from point-blank range—and, again, was the same gun which was used to kill Townes and which was left behind at Schoenberger's home—was utilized on a vital part of Santos's body. Given all of these proofs, we find that there was enough evidence to allow a reasonable jury to convict Appellant of first-degree murder for the killing of Santos.

## Weight of the Evidence

In a related claim, Appellant maintains that the guilty verdict for the first-degree murder of Luis Santos was against

---

7. The location of Appellant's residence, which was supported by documentary evidence, was uncontested at trial.

the weight of the evidence, concentrating his argument on the testimony of three of the four eyewitnesses to the event. He suggests, first, that Ms. Khabir's explanation for why she failed to identify Appellant at the police lineup was "ridiculous," and that her asserted ability, later that evening, to identify the individual in the number-one position of the lineup was "absurd." *See supra* note 1. Appellant describes this latter recitation as involving events from Ms. Khabir's "dream sequence" which occurred in the middle of the night after she had fallen asleep. As for Ms. Carrasquillo, Appellant states that her testimony was unworthy of belief because: she testified that the shooter first grabbed the chain from around Santos's neck, and then shot him (rather than shooting him first and then stealing the chain, as Ms. Khabir had stated); she described his height as approximately five-foot-two, whereas Appellant is six inches taller; and she allegedly failed to identify Appellant at a police lineup. Concerning Ms. Diaz, Appellant proffers that, since she testified that she knew Appellant and his family from the neighborhood, it is difficult to explain why she informed the police shortly after the incident that she would not be able to recognize the assailant if she saw him again. Appellant avers that these individuals were the only eyewitnesses to the crime, and that his conviction based solely upon their testimony—together with the discovery of the murder weapon in the Schoenberger residence—is sufficiently shocking to warrant a new trial. *See* Brief for Appellant at 31–33.

A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was

properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings. *See Commonwealth v. Keaton*, 556 Pa. 442, 464, 729 A.2d 529, 540–41 (1999).

We note, initially, that Appellant misrepresents the record in several material respects. For example, although Appellant indicates that the Commonwealth only presented three eyewitnesses, a fourth eyewitness—Mr. Abdu—also testified at trial and positively identified Appellant as the shooter; Appellant is silent with regard to his testimony. Additionally, contrary to Appellant's claim, there was no evidence Ms. Carrasquillo participated in a lineup or that she ever failed to identify Appellant as the shooter. Indeed, she testified that she was not asked to participate in a lineup. *See* N.T. May 2, 2001, at 100. Likewise, the suggestion that Ms. Khabir's post-lineup ability to select the person in the number one spot as the perpetrator occurred as part of a dream sequence after she had fallen asleep is contrary to the evidence.

What is left is Ms. Carrasquillo's inaccurate assessment of the shooter's height (which she gauged from a second-story window, *see id.* at 62), a minor inconsistency between Ms. Khabir's and Ms. Carrasquillo's recollection of the sequence of events, Ms. Khabir's initial failure to identify Appellant at the lineup, and the fact that Ms. Diaz's claim that she had seen the shooter around the neighborhood seemed inconsistent with her statement to the police that she would not recognize the shooter if she saw him again. The sum and substance of Appellant's contention, then, is a challenge to the credibility of three of the four witnesses who identified him at trial. The Commonwealth correctly notes that the testimony of all of these witnesses was "vigorously challenged on these points" during cross-examination, but that the jury ultimately believed their identification of Appellant as the person who shot Santos. Particularly given the other, affirmative, evidence tending to identify Appellant as the perpetrator, we cannot say that the jury's verdict was so contrary to the evidence as to shock one's

sense of justice. Thus, the trial court acted within its discretion in denying Appellant's motion for a new trial on the grounds that the verdict in the Santos matter was against the weight of the evidence.[8]

## Consolidation of the Charges

■ Appellant next alleges that the trial court abused its discretion in allowing the Commonwealth to try the charges jointly, rather than requiring three separate trials for the murders of Santos and Townes and the robbery of Schoenberger. He states that the trial court's decision to allow a joint trial in the present case created an unnecessary risk that proof of culpability with regard to one of the charged homicides would improperly inflame or influence the jury's decision-making process with regard to the balance of the charges. Appellant acknowledges that the decision of whether to allow a joint trial is committed to the sound discretion of the trial court, but submits that, here, the danger of unfair prejudice was simply too great to guarantee a fair trial. He asserts, as well, that the Commonwealth based its motion for consolidation on the theory that the ballistics evidence showed that the bullets recovered from the two decedents were fired from the gun left at the Schoenberger home, and that this, in turn, helped to identify Appellant as the shooter in both cases; Appellant posits that the Commonwealth could have accomplished this same objective by trying the two murder cases separately and introducing the circumstances of the robbery (including recovery of the gun) in each homicide trial, thereby eliminating the possibility that the jurors would be inflamed by evidence of one murder to convict him of the other murder. Appellant maintains that the two homicide cases entailed distinct and unrelated motives and the evidence as to each was individually weak.

■ Under Rule of Criminal Procedure 582 (formerly Rule 1127), distinct offenses that do not arise out of the same act or transaction may be tried together if the evidence of

---

**8.** Appellant does not raise a weight-of-the-evidence claim with regard to any other conviction.

each offense would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion. *See* Pa.R.Crim.P. 582(A)(1). While proofs concerning distinct crimes is inadmissible solely to demonstrate a defendant's bad character or his propensity to commit crimes, *see Commonwealth v. Spruill*, 480 Pa. 601, 605, 391 A.2d 1048, 1049–50 (1978), such evidence is permitted "to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others." *Keaton*, 556 Pa. at 458, 729 A.2d at 537. Furthermore, "[w]hether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." *Commonwealth v. Robinson*, 581 Pa. 154, 190, 864 A.2d 460, 481 (2004) (internal quotation marks omitted). *See generally* Pa.R.Crim.P. 583 (permitting, *inter alia*, separate trials of offenses that could otherwise be tried together if it appears that any party may be prejudiced by a joint trial).

Appellant's claim raises the question of whether evidence concerning Santos's murder would be admissible in the prosecution of the Townes homicide case, and *vice versa*. This Court's decisions in *Commonwealth v. Reid*, 533 Pa. 508, 626 A.2d 118 (1993), and *Commonwealth v. Seiders*, 531 Pa. 592, 614 A.2d 689 (1992), shed light on this question. In *Reid*, the Court addressed whether evidence of one murder could be introduced during the trial of a separate murder charge where the ten-millimeter handgun that the defendant used in the second homicide was also used in the first one (the one for which he was on trial). The Commonwealth argued that evidence that the defendant held the firearm at issue during the second incident tended to make more probable that he was the individual who fired that same weapon in the first shooting; this Court agreed:

Since the circumstances of the second murder . . . place a weapon used in both murders in the hands of Reid at the time of the second murder, the question is whether a jury

may draw an inference that Reid was the shooter in the first murder. Because empty shell casings from the same weapon were found at both murder scenes, and Reid was identified as the handgun shooter in the second murder, in which a ten millimeter bullet was found in the victim's head, evidence of the second murder is admissible to establish Reid's identity as the shooter in the first.

*Id.* at 513, 626 A.2d at 121. Thus, the Court found that the defendant's "real" objection pertained to the weight of the evidence, an issue for the jury, and not its admissibility.[9]

In *Seiders*, on the other hand, this Court reversed and remanded for a new trial. In that case, the 52–year–old defendant was charged with various offenses stemming from his sexual victimization of a six-year-old girl. At trial, the Commonwealth was permitted to introduce evidence that the defendant had previously been convicted of sexual crimes involving girls of approximately the same age. The *Seiders* court determined that the trial court abused its discretion in admitting this evidence because it was not relevant to any factual issue in the case. *See Seiders*, 531 Pa. at 596, 614 A.2d at 691.

This case is plainly much closer to *Reid* than *Seiders*. Here, as in *Reid*, a crucial piece of evidence linking the two homicides was the use of the same gun. Any conclusion drawn by the jury concerning whether Appellant was the person who used that weapon to kill Santos would bear upon the identity of the individual who shot Townes, and *vice versa*. Furthermore, we believe the jury was able to separate the evidence pertaining to the two homicides because each was (obviously) committed against a different victim, none of the eyewitnesses to the two incidents overlapped, and different investigating officers testified at trial as to each crime. *Ac-*

9. Three years before *Reid*, this Court reached a similar conclusion in another two-shooting scenario in which the same gun was used in both shootings. *See Commonwealth v. Rollins*, 525 Pa. 335, 343, 580 A.2d 744, 747–48 (1990); *see also Commonwealth v. Evans*, 488 Pa. 38, 44, 410 A.2d 1213, 1216 (1979) (allowing in evidence of a bank robbery, in which a guard's gun was stolen, during the trial for a subsequent murder committed with that gun).

*cord Keaton,* 556 Pa. at 458, 729 A.2d at 538. We acknowledge the potential for prejudice from consolidation, as the evidence tying Appellant to one of the murders could have affected the jury's consideration of whether Appellant was guilty of the other one. *See Commonwealth v. Paolello,* 542 Pa. 47, 71, 665 A.2d 439, 451 (1995). In determining whether other-crimes evidence is admissible, however, the trial court must balance this type of potential prejudice against the probative value of the evidence in question. *See Seiders,* 531 Pa. at 596, 614 A.2d at 691; *Commonwealth v. Lark,* 518 Pa. 290, 307, 543 A.2d 491, 499 (1988). Here, as explained above, the evidence was very probative, and thus, it would not be unreasonable to conclude that its probative value outweighed the potential for such prejudice.

Along these lines, in considering Appellant's suggestion concerning the potential introduction of the Schoenberger evidence at hypothetical separate murder trials, it may be noted that such proof would not have had the same probative value if used in this manner: it would only have tended to prove that the murder weapon used in each homicide was left in the Schoenberger residence by either Appellant or one of the three other assailants involved in that case. By contrast—and pursuant to the teaching of *Reid*—the proof that the gun that witnesses placed in Appellant's hands during the Santos killing was also used to kill Townes carried significant additional probative value as to the identity of Townes's killer, and *vice versa.* Under these circumstances, even if the Commonwealth could have proceeded on the murder charges separately as Appellant suggests, we conclude that the trial court acted within its discretion in permitting consolidation.

### Limitation of Detective Wynn's Testimony

Appellant next takes issue with the trial court decision to restrict Detective Wynn's testimony concerning the police lineup that was held on June 16, 1999. At trial, the defense called Detective Wynn to testify concerning the general lineup procedure and the particular events of the June 16th lineup. Before the detective took the stand, counsel told the

court that, besides Ms. Khabir, there were five other witnesses to the Santos murder who participated in the lineup, and that all of them had failed to identify Appellant as the perpetrator. The Commonwealth, however, moved to limit any testimony in this regard to the actions of Ms. Khabir, as she was the only lineup participant who had testified at trial. In granting the Commonwealth's request, the trial court indicated that the defense could call any individuals who witnessed the murder to testify about their failure to identify Appellant at the lineup, but found that any information from Detective Wynn about their actions would be irrelevant unless and until they testified at trial. The defense never did call any such persons to testify, however, *see supra* note 3, and thus, Detective Wynn provided testimony only about Ms. Khabir's participation in the lineup.

Appellant claims the trial court's ruling was in error. He maintains that the court failed to recognize that, pursuant to the business records exception to the hearsay rule, *see* Pa.R.E. 803(6), Detective Wynn's testimony concerning the actions and statements of all of the lineup participants was admissible, regardless of whether or not they personally testified at trial. The Commonwealth responds that the trial court's determination was based upon a lack of relevance, rather than the hearsay rule.

 Evidence is relevant if it tends to establish a material fact or make a fact at issue more or less probable. *See Commonwealth v. Johnson*, 556 Pa. 216, 242, 727 A.2d 1089, 1102 (1999); *Commonwealth v. Cohen*, 529 Pa. 552, 563, 605 A.2d 1212, 1218 (1992). Although one could argue that there would be some relevance to testimony from Detective Wynn that a number of individuals failed to identify Appellant at the lineup, the trial court correctly understood that any such relevance would be diminished absent the Commonwealth's ability to cross-examine those persons concerning such matters as their proximity to the events in question and their opportunity to observe what took place. Notably, these are the very types of concerns that underlie the rule against hearsay, *see Commonwealth v. Baez*, 494 Pa. 388, 395–96, 431

A.2d 909, 913 (1981) (quoting *Johnson v. Peoples Cab Co.,* 386 Pa. 513, 515, 126 A.2d 720, 721 (1956)), and it is evident that any testimony from Detective Wynn regarding the declarations of other individuals at the lineup would have been hearsay.

 Appellant attempts to overcome this conclusion by invoking the business records exception to the hearsay rule. The basis for this argument is that Detective Wynn's testimony regarding the other alleged witnesses would have been based on a set of handwritten notes that the detective made contemporaneous with the lineup, in which the statements of the other lineup participants were memorialized. *See* N.T. May 7, 2001, at 18–19. Appellant's argument fails because the challenged ruling did not pertain to a business record, but to a portion of Detective Wynn's proffered live testimony.[10] Additionally, although the handwritten notes were marked as Defense Exhibit 3, *see* N.T. May 7, 2001, at 4, they were never introduced into evidence, and are not included in the record before us. Therefore, Appellant has not demonstrated his entitlement to a new trial on the basis of the trial court's

10. Even to the extent the trial court's ruling can be interpreted as pertaining to a business record within the Rule 803(6) exception, that provision only covers one level of hearsay. Here, because the alleged business record would have contained out-of-court declarations of others individuals, and the defense sought to introduce those statements for their truth—i.e., that the other individuals did not identify Appellant as the perpetrator during the lineup—its contents would have represented double-hearsay, *accord United States v. Ismoila,* 100 F.3d 380, 391 (5th Cir.1996); *United States v. Mitchell,* 49 F.3d 769, 778 (D.C.Cir. 1995), and the business records exception would not have shielded the lineup participants' out-of-court declarations from the rule against hearsay. *Accord TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 729 (10th Cir.1993); *Pagano v. Ippoliti,* 245 Conn. 640, 716 A.2d 848, 854–55 (1998); *Manning v. Commonwealth,* 23 S.W.3d 610, 614 (Ky.2000). *See generally Schmutz v. Bolles,* 800 P.2d 1307, 1313–14 (Colo.1990) (citing cases, and observing that "[s]tatements by an outside party included within a business record have not been accorded the presumption of accuracy that attaches to statements made in the regular course of business"). Appellant, moreover, does not point to any other hearsay exception that would have encompassed the underlying statements. *See* Pa.R.E. 805 (pertaining to "hearsay within hearsay" and requiring that each level of hearsay come within some exception to the hearsay rule in order to be admissible); *Commonwealth v. Galloway,* 302 Pa.Super. 145, 448 A.2d 568 (1982).

exclusion of a portion of Detective Wynn's proffered testimony.

### Evidence of Appellant's Tattoo

Next, Appellant maintains that the trial court should not have allowed the Commonwealth to introduce evidence of his tattoo with the letters "M.O.B." He argues that the evidence was irrelevant because there was no logical connection between the tattoo and any of the charged offenses. He references several Superior Court decisions in which a new trial was granted because the jury "was exposed to the mere inference of prior bad acts by the defendant," Brief for Appellant at 45, and suggests that the only function of the tattoo evidence was to imply that Appellant had criminal propensities and was connected to illegal gang activity.

This claim has two parts. The first is a contention that evidence of the tattoo should have been excluded for lack of relevance because it had no probative value in relation to any of the crimes charged. We disagree. The Commonwealth utilized the tattoo relative to the Schoenberger robbery in conjunction with proof that another participant in the robbery—Shiem Gary—also had a tattoo with the same letters. See N.T. May 4, 2001, at 94. Thus, the Commonwealth presented the contested evidence to support an inference that Appellant was not merely present at the scene of that crime, but was an active participant in it, as he was acting in concert with Gary.

In the second part of this claim, Appellant cites Rule of Evidence 404(b) for the position that evidence of prior criminal conduct may only be admitted upon a showing that its probative value outweighs its potential for unfair prejudice. After citing this rule, however, Appellant appears to concede that it is inapplicable because of his prior assertion that the evidence was irrelevant in any event. See Brief for Appellant at 44. Thus, Appellant's argument is not entirely clear as to the manner in which he seeks to invoke Rule 404(b). Even assuming his presentation to this Court can be interpreted to

raise the contention that the trial court's ruling violated Rule 404(b)(3), *see* Pa.R.E. 404(b)(3) (stating that other-crimes evidence may only be admitted upon a showing that its probative value outweighs its potential for prejudice), Appellant failed to preserve this issue for appeal, as the objection lodged in the trial court dealt solely with the question of relevance. *See* N.T. May 4, 2001, at 17. "The rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made." *Commonwealth v. Boden,* 399 Pa. 298, 308, 159 A.2d 894, 900 (1960). *See generally Commonwealth v. Rovinski,* 704 A.2d 1068, 1075 (Pa.Super.1997). Thus, any claim based on Rule 404(b)(3) is waived. As explained infra, moreover, the relaxed waiver rule does not apply in this case.

## Prosecutorial Misconduct

 Appellant next complains of two instances of alleged prosecutorial misconduct. The first such instance involves Ms. Khabir, one of the Commonwealth's witnesses to the Santos killing. As discussed above, Ms. Khabir admitted that she failed to identify Appellant at the lineup, and sought to explain this failure by reference to her fear and anxiety which she described as stemming from intense feelings of claustrophobia. *See supra* note 1. Subsequently, while cross-examining Detective Wynn during the defense case, the prosecutor asked questions eliciting that the detention facility in which the lineup took place is, in fact, the city jail, and that it contains layers of physical security so that a lineup witness would have to walk through numerous doors that would lock behind her. *See* N.T. May 7, 2001, at 21–28. After establishing that such a witness could not simply leave on her own, the prosecutor, in an apparent reference to Ms. Khabir, asked, "A rather overwhelming experience, perhaps, for someone who is claustrophobic and afraid of being locked up in a closed space?" *Id.* at 28–29. Counsel's immediate objection was sustained, Detective Wynn did not answer, and the prosecutor did not pursue the issue. Counsel did not request a cautionary instruction or a mistrial.

232

Appellant submits that the "question" was in reality a medical opinion that the prosecutor improperly injected into the case, and that this was particularly offensive because there was no expert evidence suggesting that Ms. Khabir had ever been clinically diagnosed with claustrophobia. He states that this tactic amounted to an improper bolstering of Ms. Khabir's credibility through personally vouching for her "11th hour condition of claustrophobia." Brief for Appellant at 49.

Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. *See Commonwealth v. Williams,* 586 Pa. 553, 583, 896 A.2d 523, 541 (2006). Here, the prosecutor's recitation concerning a "rather overwhelming experience" did not amount to vouching or bolstering because it did not reflect her personal knowledge of Ms. Khabir's credibility or refer to information outside of the record tending to indicate that Ms. Khabir was believable. To the contrary, any reference to claustrophobia simply repeated the words used by Ms. Khabir herself earlier in the trial, and the jury's decision to believe or disbelieve Ms. Khabir was untainted by any suggestion of extrinsic knowledge on the prosecutor's part. *Compare Commonwealth v. Tann,* 500 Pa. 593, 602, 459 A.2d 322, 327 (1983) (finding improper bolstering where a Commonwealth witness's lawyer assured the jury that the witness had agreed to testify truthfully), *with United States v. Walker,* 155 F.3d 180, 188 (3d Cir.1998) (declining to find improper vouching where the prosecutor stated, "I submit to you that [the witnesses in question] have no motivation to lie," because the phrase "submit to you" does not constitute an assurance of credibility based on extra-record facts). Furthermore, as counsel's objection was sustained and the matter was dropped, Appellant received all the relief he requested during trial, *see Keaton,* 556 Pa. at 463, 729 A.2d at 540, and he does not presently argue that counsel was ineffective for failing to request a mistrial or any other form of additional relief.

■ The second alleged instance of prosecutorial misconduct occurred during the district attorney's summation in penalty phase, as she was attempting to convince the jury to find, as an aggravating circumstance in the Santos killing, that Appellant knowingly created a grave risk of death to another person in addition to the victim of the offense. *See* 42 Pa.C.S. § 9711(d)(7). After reminding the jurors that Santos's son, Jaquan, was in the car near the spot where Santos was killed, she highlighted the physical proximity as follows:

And you heard where Jaquan was, in fact, at the time his dad was shot at the driver's side of the car. The gunshot wound in Luis Santos went in the left side of his back, came out the right chest, and then reentered in his right forearm. This is where that bullet was taken out of. This is where the car window with that little two year old was. Six inches away.

[Defense Counsel]: I'm going to object. I don't mean to interrupt the Commonwealth. That's not in evidence.

The Court: It's the jury's recollection of the evidence that's controlling in the case. It's not yours, or hers, or even this Court's. Carry on, Commonwealth.

N.T. May 10, 2001, at 131–32. Appellant argues that the reference to "six inches away" constitutes prosecutorial misconduct warranting a new penalty phase because there was no evidence in the record that the child was six inches from the shooting. He states that the prosecutor's allegation in this regard was designed to inflame the jurors so that they would be driven by their emotions to impose the death penalty.

Although Appellant is correct in stating that there was no proof concerning the exact distance that Jaquan was from the shooting, the evidence did tend to show that Santos was touching the driver's door of his car when he was shot and that Jaquan was standing up in the front seat at the time. Regardless, even if we were to assume, *arguendo*, that the prosecutor's remark was inappropriate, Appellant would not be entitled to relief because prosecutorial misconduct is evaluated under the harmless error standard, *see Commonwealth v. Miles*, 545 Pa. 500, 515, 681 A.2d 1295, 1302 (1996), and the

error here (if any) was harmless beyond a reasonable doubt as the jury did not find the (d)(7) aggravator. *Cf. Commonwealth v. Jones*, 542 Pa. 464, 521–22, 668 A.2d 491, 519 (1995) ("[R]eversal of a defendant's sentence is not warranted by submitting an aggravating circumstance to the jury if the jury does not find beyond a reasonable doubt the existence of that improper aggravating circumstance in rendering its verdict of death since such error is harmless.").[11]

## Flight Charge

In its guilt phase instructions, the trial court recounted that there was evidence that Appellant fled from the authorities that arrived on the scene of the Schoenberger home invasion and robbery. The court then instructed the jury that, under some circumstances, fleeing from the police can be considered as evidence of consciousness of guilt. Appellant maintains that this instruction constituted reversible error because the court did not expressly limit its applicability to the Schoenberger charges, thereby suggesting that the jury could interpret his running from the police as consciousness of guilt concerning the two murders. This claim is waived, as Appellant did not request that the flight charge be limited or object to it as given at trial. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Although this Court previously adopted a "relaxed waiver" rule to address the merits of waived claims in capital direct appeals, *see, e.g., Commonwealth v. DeJesus*, 567 Pa. 415, 434 n. 13, 787 A.2d 394, 405 n. 13 (2001), that doctrine was later abolished, *see Commonwealth v. Freeman*, 573 Pa. 532, 560, 827 A.2d 385, 402 (2003), and the abolition was made applicable to cases in which the appellant's brief was not yet filed in this Court and was not due until June 29, 2003, or later. *See id.* at 562, 827 A.2d at 403; *Commonwealth v. Dowling*, 584 Pa. 396, 410 n. 9, 883

---

11. Appellant apparently recognizes this deficiency in his claim and attempts to overcome it by arguing that the prosecutor's remarks caused the jury not to find any of his proffered mitigating circumstances in relation to the Santos murder. *See* Brief for Appellant at 51. This assertion is not supported by the record and is wholly speculative.

A.2d 570, 578 n. 9 (2005). As Appellant's brief was due after that date, he cannot avail himself of the relaxed waiver rule.

## Ineffective Assistance of Counsel

 Appellant's final claim is that his trial counsel was ineffective for several reasons.[12] Claims of trial counsel ineffectiveness are generally deferred to post-conviction review so that they may be properly developed on a full and complete evidentiary record. *See Commonwealth v. Grant*, 572 Pa. 48, 64, 813 A.2d 726, 736–37 (2002). Appellant contends that his ineffectiveness allegations fall under an exception to the *Grant* rule for claims on direct appeal where an evidentiary record and trial court opinion addressing them exist. *See Commonwealth v. Bomar*, 573 Pa. 426, 466, 826 A.2d 831, 855 (2003). However, there has been no hearing at which trial counsel testified concerning his strategy during trial, which is an essential prerequisite to the *Bomar* exception. *See id.* at 464, 826 A.2d at 853; *Commonwealth v. May*, 584 Pa. 640, 654–65, 887 A.2d 750, 758 (2005); *Commonwealth v. Davido*, 582 Pa. 52, 69 n. 16, 868 A.2d 431, 441 n. 16 (2005); *Commonwealth v. Dougherty*, 580 Pa. 183, 196, 860 A.2d 31, 38–39 (2004); *Commonwealth v. Malloy*, 579 Pa. 425, 448, 856 A.2d 767, 781 (2004). Accordingly, Appellant's ineffective assistance claims must be deferred to post-conviction proceedings under the rule announced in *Grant*.

## Statutory Review

 Having concluded that Appellant's convictions were proper and that none of his claims of error entitle him to relief, we must affirm each death sentence unless we find that: (i) the sentence was the product of passion, prejudice,

12. Appellant states that counsel was ineffective for: eliciting that Appellant was a drug dealer during his cross-examination of Natasha Evans; failing to impeach Ms. Evans's credibility with a prior inconsistent statement; failing to object to the admission of an identification card of Appellant issued by a school for juvenile delinquents; failing to mark and move into evidence a police lineup photograph; and failing to request suppression of evidence concerning Ms. Redden's identification of Appellant from a photographic array. *See* Brief for Appellant at 56–67.

or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3). Upon careful review of the record, we are persuaded that the death sentences were not the product of passion, prejudice, or any other arbitrary factor, but resulted from properly introduced evidence that Appellant intentionally and deliberately shot to death Luis Santos and William Townes. We also conclude that the evidence was sufficient to support the aggravating factors found by the jury in relation to each killing. The fact that Appellant was convicted of robbery in connection with the shooting of Santos provides sufficient evidence for the aggravating factor that Appellant committed the killing in perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). Additionally, Appellant's conviction of the first-degree murder of Santos provides sufficient evidence for the two aggravating circumstances found in relation to the Townes killing-namely, that Appellant had been convicted of another offense for which a sentence of life imprisonment or death was imposable, *see* 42 Pa.C.S. § 9711(d)(10), and that he had been convicted of another murder. *See* 42 Pa.C.S. § 9711(d)(11).

For the foregoing reasons, we affirm the verdicts and sentences of death. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with Section 9711(i) of the Judicial Code, 42 Pa.C.S. § 9711(i).

Former Justice NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY and Justices CASTILLE and EAKIN join the opinion.

Justice BALDWIN files a dissenting opinion in which Justice BAER joins.

## *DISSENTING OPINION*

Justice BALDWIN.

I respectfully dissent because I believe that it was unduly prejudicial to Appellant to consolidate the three separate cases

for trial. While it is of course true that under Pa.R.Crim.P. 582(A)(1) it is permissible to try separate cases together, it is equally true that the rule makes this permissible only if the evidence "is capable of separation by the jury so that there is no danger of confusion." Pa.R.Crim.P. 582(A)(1)(a). In addition, if consolidating unrelated cases would cause undue prejudice to the defendant, consolidation is not warranted. We have spoken cogently on the prejudice that could result:

> The argument against joinder or consolidation is that where a defendant is tried at one trial for several offenses, several kinds of prejudice may occur: (1) The defendant may be confounded in presenting defenses, as where his defense to one charge is inconsistent with his defenses to the others; (2) the jury may use the evidence of one of the offenses to infer a criminal disposition and on the basis of that inference, convict the defendant of the other offenses; and (3) the jury may cumulate the evidence of the various offenses to find guilt when, if the evidence of each offense had been considered separately, it would not so find.

*Commonwealth v. Morris*, 493 Pa. 164, 171, 425 A.2d 715, 718 (1981) (citations omitted). Our Court has been careful to ensure that evidence of other crimes is not available for the jury to use as evidence that a defendant has a criminal disposition. For example, in *Commonwealth v. Spruill*, we stated:

> Evidence of prior criminal activity [ ] is probably only equaled by a confession in its prejudicial impact upon a jury. Thus, fairness dictates that courts should be ever vigilant to prevent the introduction of this type of evidence under the guise that it is being offered to serve some purpose other than to demonstrate the defendant's propensity to commit the charged crime.

*Spruill*, 480 Pa. 601, 606, 391 A.2d 1048, 1050–51 (1978).

Our criminal justice system is centered upon the premise that an accused must have a fair trial, and be tried based on evidence tied to the charges against him. *Commonwealth v. Seiders*, 531 Pa. 592, 595, 614 A.2d 689, 691 (1992) ("It is

essential, both to the accused and to our system of criminal justice, that an accused obtain a trial on the specific charges against him and that he not be convicted on grounds that he possesses a criminal nature.") Moreover, our courts have recognized that juries are likely to consider evidence of unrelated criminal activity as supporting a finding of guilt. For example, the Superior Court noted in *Commonwealth v. Harris:*

> The law is well settled in Pennsylvania that the prosecution may not introduce evidence of defendant's prior criminal conduct as substantive evidence of his guilt of the present charge. The purpose of this rule is "to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more liable to commit the crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty and thus effectively to strip him of the presumption of innocence."

*Harris,* 263 Pa.Super. 110, 397 A.2d 424, 427–28 (1979) (citations omitted).

The purpose for the consolidation in this case, according to the Commonwealth's request, was to establish the identity of Appellant as the murderer in both the Santos and Townes homicides. Even if the evidence in one of the murder cases was admissible in the other, the majority fails to weigh whether the jury might consider its finding of Appellant's guilt in one of the murders probative of his guilt in the other. This is the mischief that holding separate trials is designed to prevent. The gun recovered from the Schoenberger burglary tied the appellant to both murders, as the evidence established that the bullets from that gun were the same as the bullets recovered from the bodies of the two decedents. Thus, it would not have been error to consolidate the Schoenberger burglary case with one of the murder cases, as evidence

admissible in one would be admissible in the other, and as the transactions and facts of the cases were so distinct that there would be little danger of jury confusion.

However, in my opinion, the two unrelated homicides should have been tried separately. In each one, the evidence in the Schoenberger burglary case regarding the gun would be admissible to establish the perpetrator's identity. However, the evidence from the Santos murder would not have been admissible in the prosecution of the Townes murder, and *vice versa.* The majority equates these cases to *Commonwealth v. Reid,* 533 Pa. 508, 626 A.2d 118 (1993), in which we found that evidence of a second murder was admissible to establish Reid's identity as the shooter in a first murder. In *Reid,* there were no eyewitnesses to the first murder, and the evidence of the shooter's identity was thus circumstantial. Under such circumstances, evidence that Reid was the shooter in the second murder, and the same gun was used in both shootings, tended to establish Reid's identity as the shooter in the first murder. In this case, however, aside from the use of the same gun, there was no evidence in the Santos case that would have been relevant in the Townes murder case, except that a black man wearing a puffy black jacket had a tendency to commit murder, which is of course impermissible. Allowing the two murder trials to be consolidated would likely have the effect of leading the jury to believe that Appellant must have murdered Townes since the evidence was clear that he murdered Santos.

Finally, I must point out that judicial economy is never a valid basis for consolidation of unrelated offenses, and only exacerbates the prejudice of presenting evidence of more than one offense to the jury. As we noted in *Morris:*

> [T]he conservation of judicial resources and the efficient administration of justice, while estimable goals, does [*sic*] not justify the exposure of an accused to such a higher probability of prejudice. "When offenses are initially joined on the ground that they are of the same or similar charac-

ter, and evidence of one offense would not be admissible at a separate trial for the other, the saving of time effected by a joint trial is minimal." More importantly, the saving of judicial time can never be given preference over the integrity of the factfinding process. When it is concluded that the evidence of the one crime would not be admissible in the separate trial for the other, we are in effect saying that the evidence is irrelevant and prejudicial in the second trial. To allow irrelevant and prejudicial evidence to influence a verdict in the name of judicial economy is abhorrent to our sense of justice.

*Commonwealth v. Morris*, 493 Pa. at 174, 425 A.2d at 719–20 (citation omitted).

In sum, trying the murder cases jointly created a strong likelihood that the jury would infer that Appellant had a propensity to commit the crimes charged, and this would have influenced the jury in its determinations of guilt and in deliberating in the penalty phase. It is hard to imagine a more prejudicial effect on a defendant than being convicted for a murder on the basis of compelling evidence that the defendant committed a *different* murder. While I recognize that even with separate trials the result might not have been different for Appellant, I am convinced that it is our responsibility to ensure that every protection is provided for a fair trial, particularly in capital cases.

Justice BAER joins this dissenting opinion.