J-A22001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DOMINIC J. FLEMISTER | |
| Appellant | No. 1951 MDA 2015 |

Appeal from the Judgment of Sentence September 17, 2015
in the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0002037-2015

BEFORE:  GANTMAN, P.J., PANELLA, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED SEPTEMBER 08, 2016**

Dominic Flemister ("Appellant") appeals the judgment of sentence entered September 17, 2015 in the Dauphin County Court of Common Pleas following his jury trial convictions for attempted murder,[1] aggravated assault,[2] and firearms carried without a license.[3]  After careful review, we affirm.

The trial court summarized the underlying facts of this matter as follows:

---

[1] 18 Pa.C.S. § 901.

[2] 18 Pa.C.S. § 2702.

[3] 18 Pa.C.S. § 6106.

In late April[] 2014, James Hill, a friend of [Appellant], known by the nickname "Kool Aid" or "Laid", saw [Appellant] arguing with another person at an after-hours club on 19th Street in Harrisburg. On the same evening, after witnessing the argument at the club, Hill next saw [Appellant] get out of his black Chrysler in the area of 17th and Swatara Streets and continue the argument with the same person. As Hill was walking on 17th Street[,] he heard two shots. Hill looked in the direction of the shots and saw [Appellant] get into his car and pull off. Hill walked several blocks to his cousin's house where he sat on the porch. About 10-20 minutes later, [Appellant] called out to Hill. The two spoke in an alleyway on Swatara Street. [Appellant] told Hill that the "other guy", the victim, had tried to take a swing at him and that [Appellant] "had to do somethin' to him" or "somethin' had to be done to him". As they spoke in the alleyway, Hill observed that [Appellant] had a gun. Hill did not contact police because Hill was friends with [Appellant] and did not want to "rat him out." Hill spoke to police after they contacted him through his girlfriend.

On April 25, 2014, at 3:43 a.m., while on patrol in the area of 17th and Derry Streets in a marked police vehicle, [] Harrisburg Police Officer Angel Diaz heard a woman screaming. Officer Diaz activated the emergency equipment on the police vehicle and pulled toward South 17th and Swatara Streets where he saw the woman in the street. Officer Diaz saw a person, later identified as Rodney Dunbar, lying on his back on the porch at 411 South 17th Street bleeding profusely from the groin. Officer Diaz spoke to Mr. Dunbar to keep him awake until emergency personnel arrived. Officer Diaz accompanied Mr. Dunbar in the ambulance en route to the Hershey Medical Center. During the ambulance ride, Dunbar stated, "they tried to kill me."

Brianna Chambers, Rodney Dunbar's[] girlfriend[,] lived with him at the 400 Block of 17th Street. On the night of the incident, while she was on the porch, she observed [Appellant] and another person approach Dunbar. Approximately ten feet from the porch, a fight broke out between Dunbar and [Appellant]. Ms. Chambers heard the sound of a gunshot from the location of the fighting. Ms. Chambers observed neighbors in the area at the time although they were apart from the fight and did not participate. Upon realizing that Dunbar had been shot, Ms. Chambers began screaming and called 911.

From the scene, police collected a shell casing from a revolver. Pennsylvania State Police records reflect that on April 25, 2014, [Appellant] did not possess a valid license to carry a firearm.

Rodney Dunbar sustained a gunshot wound to the left thigh which caused obliteration of multiple femoral vessels for which he underwent multiple surgeries for artery repair as well as blood transfusions.

On the morning after the shooting, on April 2[5], 2014, Harrisburg Police Detective Ryan Neal met with Brianna Chambers. From a photo array, Ms. Chambers identified [Appellant] as the person who fought with and shot Rodney Dunbar. In a second photo array, Ms. Chambers identified an individual named Najee Banks as the person [who] accompanied [Appellant]. Ms. Chambers did not identify Najee Banks as a person who fought with [Appellant]

Because Mr. Dunbar had undergone surgery, Detective Neal had only brief contact with him in the initial days following the shooting. In one of those early visits, on April 26, 2014, in response to a question as to whether he recognized anyone in the photo array, Dunbar circled [Appellant's] picture. Detective Neal noted on the picture "Unable to sign due to the circumstances." In a subsequent visit, Detective Neal again showed Dunbar a photo array. Dunbar circled a picture of [Appellant] and stated, "That's the boy that shot me." When Detective Neal asked Dunbar "who is that guy that is circled?" Dunbar responded, "Kool Aid." Dunbar signed and noted the date and time on the photo array. Detective Neal asked, "Now as far as this Kool Aid guy, how certain are you that this is the person that shot you?" to which Dunbar responded "Yeah, I'm 100 (*sic*) for sure."

At trial, in response to questioning by the prosecutor, Rodney Dunbar acknowledged only that he recall[ed] being shot on the night in question, [that he had] to undergo multiple surgeries[,] and that he remained hospitalized for approximately one month. After proper foundation, the [c]ourt permitted the prosecutor to treat Mr. Dunbar as a hostile witness. After Dunbar's refusal to answer questions at trial, the [c]ourt directed that he cooperate [by] reading the transcribed recorded statement he gave Detective Neal, or, in the alternative, allow the prosecutor to read the transcript into evidence. Dunbar

reluctantly cooperated with the reading. In the transcribed recorded statement, Dunbar stated,

> We were all at the crib playing cards and music. So I left 2:00 (*sic*) to go to Forever Nights. So I seen him, seen Kool Aid at Forever Nights. We had some words. So after that I left. Walking to, walking to back to my house. So I seen Kool Aid come out, hop out, hop out of this black, black car. He came up to me talkin' about, oh yeah you wanna act tough now? You wanna act tough shit? I was, like, what's up, and that's when we start. We start tearin it. And then after that everything was done. He felt some type of way. He shot at me. And that's when I ran to the porch and laid down. And that's when my baby mom[4] called the cops, called the ambulance.

In the statement, Dunbar told Detective Neal that [Appellant] pulled the gun from his pocket. [Appellant] shot Dunbar from a distance of 15-20 feet.

Around mid-day on April 28, 2014, Harrisburg Police and FBI Task Force Officer Richard Gibney received a phone call from [Appellant's] cousin, William Flemister. Officer Gibney had dealt with William in the past and knew of [Appellant]. William Flemister related that he saw on the internet that Harrisburg Police wanted [Appellant]. William Flemister stated that he would have [Appellant] call Officer Gibney.

[Appellant] called Officer Gibney at approximately 3:15 p.m. that day. [Appellant] stated that he did not shoot anyone. Officer Gibney urged [Appellant] to meet with him and lead detective Ryan Neal. In the phone conversation, [Appellant] told Officer Gibney of his whereabouts on the night of the incident, up to the point of his going to a pizza shop at 17th and Derry Streets at 1:45 a.m. [Appellant] gave no information about his whereabouts after 1:45 a.m. [Appellant] told Officer Gibney that he knew Rodney Dunbar and that they had an altercation a few weeks before because he heard that Dunbar was spreading rumors about him. [Appellant] made no further contact with

---

[4] The term "baby-momma" or "baby mom" refers to a woman who is the mother of a man's child, although not necessarily married to that man.

Officer Gibney. Officers apprehended [Appellant] on May 20, 2014.

Trial Court Pa.R.A.P. 1925(a) Opinion, February 22, 2016 ("1925(a) Opinion"), pp. 2-7 (internal record citations and footnote omitted).

Following a trial that occurred on August 19 and 20, 2015, the jury convicted Appellant as discussed **supra**. On September 17, 2015, the trial court imposed an aggregate sentence of 20-40 years' incarceration.[5] This timely appeal followed.[6]

Appellant raises the following three (3) claims for our review:

1. Where the shooter was 15-20 feet away from the victim and the victim was shot in the leg, is there intent to kill?

2. Whether the [j]ury's finding of guilt on count 1, [c]riminal [a]ttempt – [m]urder of the [f]irst [d]egree, is against the weight of the evidence when the victim did not remember who shot him and no one saw who shot the victim[?]

3. Whether the [j]ury's finding of guilt on count 2, [a]ggravated [a]ssault, is against the weight of the evidence when the victim did not remember who shot him and no one saw who shot the victim[?]

Appellant's Brief, p. 6.

_____

[5] Specifically, the trial court sentenced Appellant to 20 to 40 years' incarceration on the attempted murder conviction, 9 to 18 years' incarceration on the aggravated assault conviction to be served concurrently to the attempted murder conviction, and a further 3½ to 7 years' incarceration on the firearms not to be carried without a license conviction, also to be served concurrent to the attempted murder conviction.

[6] Both the trial court and Appellant complied with Pa.R.A.P. 1925.

First, Appellant challenges the sufficiency of the evidence proffered by the Commonwealth to convict him of attempted murder. *See* Appellant's Brief, pp. 14-23. Specifically, Appellant argues the Commonwealth failed to prove beyond a reasonable doubt that he intended to kill the victim. *Id.* This claim fails.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super.2011), *appeal denied*, 32 A.3d 1275 (Pa.2011) (quoting *Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa.Super.2005)).

The Crimes Code provides:

>  **(a) Definition of attempt.–**A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime.

18 Pa.C.S. § 901. "A person may be convicted of attempted murder if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act." ***Commonwealth v. Jackson***, 955 A.2d 441, 444 (Pa.Super.2008) (internal citations and quotations omitted). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." ***Id.*** "[A]ttempted murder requires an intent to bring about that result described by the crime of murder (i.e., the death of another)." ***Commonwealth v. Geathers***, 847 A.2d 730, 734 (Pa.Super.2004). "The *mens rea* required for first-degree murder, specific intent to kill, may be established solely by circumstantial evidence." ***Jackson***, 995 A.2d at 444. "The law permits the fact finder to infer that one intends the natural and probable consequences of his acts." ***Id.*** "The offense of attempt to kill is completed by the discharging of a firearm at a person with the intent to kill, despite the fortuitous circumstances that no injury is suffered." ***Commonwealth v. Mapp***, 335 A.2d 779, 781 (Pa.Super.1975) (necessary intent found for attempted murder where defendant shot at victim and missed). Additionally, our Supreme Court has repeatedly determined that "[t]he use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill" required for a first-degree murder

conviction. *See Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa.2007); *Commonwealth v. Cousar*, 928 A.2d 1025, 1034 (Pa.2007) ("a specific intent to kill may be inferred from the use of a deadly weapon on a vital part of a victim's body."). Further, evidence of flight is admissible for the purpose of establishing guilty knowledge. *Commonwealth v. Gooding*, 649 A.2d 722, 726 (Pa.Super.1994) (*citing Commonwealth v. Jones*, 319 A.2d 142, 149 (Pa.1974)).

Here, viewing all of the evidence in the light most favorable to the Commonwealth, there was sufficient evidence for the jury to find that Appellant used an unlicensed handgun to inflict injury on a vital part of the victim's body. Thus, we do not hesitate to find that there was sufficient evidence to enable the fact-finder to find every element of attempted murder beyond a reasonable doubt. This claim fails.

Appellant's second and third issues raise claims that the jury's verdict was against the weight of the evidence. *See* Appellant's Brief, pp. 24-34. These claims lack merit.

The denial of a new trial based on a lower court's determination that the verdict was not against the weight of the evidence is one of the least assailable reasons for granting or denying a new trial. *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa.2013). This Court reviews weight of the evidence claims pursuant to the following standard:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no

- 8 -

obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa.2000) (internal citations, quotations, and footnote omitted).

Stated differently, a court may award a new trial because the verdict is against the weight of the evidence only when the verdict is so contrary to the evidence as to shock one's sense of justice,[7] "such that right must be given another opportunity to prevail." *Commonwealth v. Goodwine*, 692 A.2d 233, 236 (Pa.Super.1997). Moreover, appellate review of a weight

---

[7] This Court has explained the notion of "shocking to one's sense of justice" as follows:

When the figure of Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.

*Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa.Super.2004) (internal citations and quotations omitted).

claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. *Widmer*, 744 A.2d at 753. When reviewing the trial court's determination, this Court gives the gravest deference to the findings of the court below. We review the court's actions for an abuse of discretion. *Id.*

Simply stated, the jury's verdict in this matter illustrates that the jury found credible the witness testimony regarding Appellant's conduct prior to, during, and after the shooting. Our review of the trial transcript reveals the trial court did not abuse its discretion in denying a new trial based on the weight of the evidence.[8] Accordingly, Appellant's weight of the evidence claims fail.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/8/2016

---

[8] Appellant's reliance on the victim's reluctance to testify at trial is misplaced. As the Commonwealth properly notes, victim/witness recantation is not uncommon in matters of violent street crime. In any event, the victim's reluctance did not prevent the jury from finding Appellant guilty of the crimes with which he was charged.