J. S25040/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| HOWARD DEMETRIUS TUCKER, | : | No. 962 EDA 2016 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, March 2, 2016,
in the Court of Common Pleas of Montgomery County
Criminal Division at No. CP-46-CR-0009299-2012

BEFORE:  BENDER, P.J.E., RANSOM, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED AUGUST 15, 2017**

Howard Demetrius Tucker appeals from the judgment of sentence of March 2, 2016, following his conviction of various sexual offenses involving three separate victims over the same three-month time period.  Each of the victims was assaulted at Central Montgomery County Mental Health and Mental Retardation Center ("Central"), where appellant was employed as a team leader of the certified peer specialists.  Two of the victims were clients of Central, and the third was a job applicant being interviewed by appellant.  All of them had experienced prior sexual abuse as children.  As described *infra*, appellant used his position of authority and trust to sexually assault the emotionally vulnerable female victims.  On appeal, appellant challenges the sufficiency of the evidence to sustain his conviction of rape by forcible compulsion and raises other issues including denial of his pre-trial motion to

sever. After careful review, we affirm. We caution the reader that the details of the sexual assaults are necessarily factually graphic due to the specific issues presented by appellant.

> At trial the following facts were established. Victim D.J.[1] had been receiving services from [Central] located in Norristown, Montgomery County during the relevant time period. D.J. has a history of mental illness and childhood sexual abuse. Because of the childhood sexual abuse she suffered, she had gone to Central as a child. She stopped going, but returned there for rape trauma as an adult for counseling and drug and alcohol treatment.

> D.J. first met [appellant] in 2011. He asked her many questions, wanted to know her background and why she was coming to Central. He inquired as to what groups at Central D.J. was attending. During the course of that conversation, it came out that D.J. had been sexually molested as a child.

> Not long after their first meeting, D.J. saw [appellant] at Central while she was there for her regular therapy sessions. She saw him in the hallway, and [appellant] asked her to come to his office for the purpose of helping her with job seeking activities. Once in his office, [appellant] shut the door. That day, D.J. was wearing religious overgarments, and [appellant] said they look nice and that he wanted to see what was under them. D.J. leaned on [appellant]'s desk to see the papers he wanted her to look at. [Appellant] was behind D.J., rubbing against her buttocks. D.J. testified that he was so close to her that she could feel that he had an erection. D.J. tried to get out of [appellant]'s office, but it was locked. [Appellant] unlocked it, and she was able to get away.

> About a week later, D.J. saw [appellant] in the hallway at Central. [Appellant] told D.J. that he

---

[1] We will use the victims' initials to protect their identities.

wanted to talk to her, saying that he had a surprise for her. D.J. was reluctant to follow him but [appellant] persisted and she relented. [Appellant] shut the door and locked it. D.J. was seated in a chair and [appellant] sat in a chair next to hers. [Appellant] took out his penis from his pants. D.J. was [sic] felt empty, scared and shocked. [Appellant] said, "You know you want this" and told her to kiss his penis. D.J. responded, "That's just for my husband." That didn't stop [appellant]'s persistence. He took D.J.'s hand and placed it on his penis. D.J. testified that his penis was long, brown and erect. Next, [appellant] took his hands and placed them on the back of D.J.'s head and forced her head down and his penis into her mouth. [Appellant] thrusted his pelvis back-and-forth, stood up and ejaculated. As soon as it was over, D.J. got out of [appellant]'s office.

The fourth time D.J. saw [appellant] at Central was in the hallway again. He called her over telling her that he wanted to talk and show her some list in his office. [Appellant] ushered D.J. into his office. Back in the office, [appellant] once again closed and locked the door. [Appellant] grabbed D.J. from behind by putting his arms around her waist, rubbing his erect penis against her buttocks. He pulled up her religious overgarments, under which D.J. was wearing her underwear. [Appellant] bent her over his desk and penetrated her vagina from behind. It ended when [appellant] ejaculated inside of D.J.

The fifth time D.J. came into contact with [appellant] was when he pulled her out of one of her therapy groups. Telling D.J. that he had some papers for her in his office regarding places for her to live since she was homeless, she went with him. Again [appellant] closed and locked his door. With D.J.'s back against the door, [appellant] leaned his body, from his chest down to his pelvis, up against her and was grinding on her. D.J. tried to push [appellant] away with her broken wrist while she

tried to get out of the door.[2]  [Appellant] put his hand on the back of D.J.'s head and pushed his penis into her mouth.  Next, [appellant] bent D.J. over, pulled her underwear to the side and put his penis in her vagina where he ejaculated.

On October 27, 2011, D.J. ultimately told someone at Central what [appellant] did.  The police were called and D.J. gave a statement.

Trial court opinion, 6/8/16 at 3-5 (citations to the transcript omitted).

L.H. testified that she was also receiving services from Central, including housing assistance.  (Notes of testimony, 3/23/15 at 80.)  Like D.J., L.H. was also the victim of childhood sexual assault.  (*Id.*)  L.H. was being treated for major depression.  (*Id.* at 30-31, 79.)

L.H. testified that in mid-July 2011, she was at Central for an appointment when appellant approached her in the lobby.  (*Id.* at 86.)  Appellant informed her that the staff members with whom she had the appointment were unavailable and directed her into his office.  (*Id.* at 86-87.)  L.H. testified that appellant told her a woman her age was at her "sexual peak" and "could handle him."  (*Id.* at 91.)  Appellant pulled his chair closer to hers and said, "touch it."  (*Id.* at 91-92.)  L.H. looked down and saw that appellant had pulled his erect penis out of his pants.  (*Id.* at 92.)  L.H. described it as "very large, very long."  (*Id.* at 95.)  Appellant

---

[2] D.J. testified that she had a broken left wrist and did not have full use of her arm at that time.  (Notes of testimony, 3/24/15 at 205.)  She had a soft cast on her arm.  (*Id.*)

took her hand and placed it on his penis, making a rubbing motion. (*Id.* at 94.) L.H. testified that she was in shock and did not know what to do. (*Id.*)

At this point, appellant stood up and shoved his penis into L.H.'s mouth, telling her that, "he thought I could handle his penis." (*Id.* at 95.) Appellant shoved his penis down L.H.'s throat and she started gagging. (*Id.*) Appellant put his hands on her shoulders and was thrusting his penis in and out of her mouth, "in a manner similar to having intercourse." (*Id.*) Appellant finally ejaculated into L.H.'s mouth and wiped himself off with a paper towel. (*Id.* at 96-97.) Appellant told L.H. not to tell anyone and that "this is our secret." (*Id.* at 97.) L.H. testified that she did not consent to appellant shoving his penis into her mouth and that the office door was locked. (*Id.* at 97-98.) L.H. testified that she did not tell anyone about the incident because she was embarrassed and afraid no one would believe her. (*Id.* at 98-99.)

At the beginning of August 2011, L.H. returned to Central for another appointment with a certified peer specialist. (*Id.* at 99.) Her appointment was not with appellant. (*Id.* at 100.) Again, as she sat in the reception area, appellant came out of his office, put his arm around L.H.'s shoulders and walked her into his office, shutting the door and locking it. (*Id.*) However, in an attempt to stave off another assault, L.H. showed appellant the bruises she had from her abusive boyfriend, and appellant took her to

see the certified peer specialists to try to find her a shelter to stay in that night. (*Id.* at 100-101.)

Later in August, L.H. returned to Central for an appointment with a psychiatrist. (*Id.* at 101.) As L.H. waited in the lobby, appellant approached her and told her to come into his office. (*Id.* at 102.) L.H. informed appellant that she was waiting for her appointment with the psychiatrist, Dr. Sierra. (*Id.*) Appellant then instructed the receptionist to call his office when Dr. Sierra was available, that L.H. would be in his office. (*Id.*) Appellant then took L.H. into his office, closed the door, and locked it. (*Id.* at 102-103.) Appellant put his hands on L.H.'s shoulders and forced her down to the ground on her knees. (*Id.* at 106.) L.H. testified that it hurt because she has degenerative arthritis in her right knee. (*Id.*)

Appellant proceeded to unzip his pants, remove his erect penis, and shove it down L.H.'s throat. (*Id.* at 107.) L.H. testified that she was gagging and could not breathe. (*Id.*) While appellant was shoving his penis down L.H.'s throat, he had both hands positioned on the back of her head. (*Id.*) Again, L.H. testified that appellant was thrusting his pelvis as though having intercourse. (*Id.* at 107-108.) L.H. was unable to move her head or speak. (*Id.* at 108.) L.H. tried to push appellant away with her hand against his leg, but was unsuccessful. (*Id.*) Eventually, appellant ejaculated inside of L.H.'s mouth and wiped himself off with a towel. (*Id.* at 109.) At the same time, the phone rang and appellant answered it. (*Id.*)

The receptionist was calling to say that Dr. Sierra was ready to see L.H. (*Id.*) Appellant told L.H. that "this is our secret," and not to tell anyone, that he could lose his job. (*Id.* at 110-111.) Appellant gave L.H. some water and a paper towel and escorted her out of his office. (*Id.* at 109-110.)

Later, L.H. returned to Central to seek alternative housing because of her abusive relationship with her boyfriend. (*Id.* at 112.) Again, as she waited in the reception area for her appointment, appellant came up to her and put his arm around her and guided her into his office. (*Id.* at 113.) Appellant closed the office door and locked it. (*Id.* at 114.) Appellant directed L.H. to sit in his chair. (*Id.*) L.H. testified that appellant was touching her arms as he guided her into the chair. (*Id.* at 115.) Appellant then unzipped his pants and pulled out his erect penis. (*Id.* at 114-115.) Appellant shoved his penis into L.H.'s mouth while his hands were placed on top of her shoulders. (*Id.* at 115-116.) At some point, he withdrew his penis from her mouth, stood her up and turned her around, trying to unbutton her jeans in the same motion. (*Id.* at 116.) L.H. realized that appellant intended to have sexual intercourse with her, at which time she pushed him away. (*Id.* at 117.) L.H. testified that somehow she was able to get out of his office and she left. (*Id.*) L.H. testified that she did not consent to any of appellant's actions, verbally or non-verbally. (*Id.* at 118-119.)

After this third assault, L.H. testified that she avoided going to Central and kept canceling her appointments. (*Id.* at 119.) Eventually, two of Central's employees, Valarie O'Connor and Karleen Caparro, drove out to L.H.'s house. (*Id.* at 120.)[3] They took L.H. to a nearby diner where she disclosed what appellant had done to her. (Notes of testimony, 3/23/15 at 121.) L.H explained that is why she had been canceling her appointments at Central. (*Id.*)

Like appellant's two other victims, S.T. was also molested as a child. (Notes of testimony, 3/25/15 at 15.) S.T. had been molested by her uncle and her brother. (*Id.*) S.T. was seeking to become a certified peer specialist, and a friend told her about the program at Central. (*Id.* at 7, 11.) Appellant gave S.T. an employment application to fill out, and she returned to Central the following day with the completed application. (*Id.* at 11-12.) While she was waiting at the front desk, appellant came out and told S.T. to come into his office. (*Id.* at 12.) Once inside, appellant closed the door. (*Id.* at 13.) Appellant questioned S.T. about her past, and S.T. finally revealed that she had been sexually molested by her uncle and her brother. (*Id.* at 14-15.) Appellant pressed S.T. for details. (*Id.* at 16.) S.T. said that she had been raped. (*Id.*) S.T. explained that when she was

---

[3] Caparro was a certified peer specialist, and O'Connor was the operations coordinator. (Notes of testimony, 3/23/15 at 18; 3/24/15 at 71.) At time of trial, O'Connor was the president and CEO of Central. (Notes of testimony, 3/24/15 at 70-71.)

five years old, she was playing with her dolls when her uncle pulled down her pants and got on top of her. (*Id.*) Appellant responded, "That's not being raped. That's being molested." (*Id.*) Appellant volunteered that he had also been molested by his aunt, a babysitter, and a cousin. (*Id.* at 15.)

At that point, appellant stated, "Well, I can show you why I was molested." (*Id.* at 17.) Appellant rolled his chair around and exposed his erect penis through the zipper of his pants. (*Id.* at 17-18.) Appellant told S.T. to "touch it," but she refused. (*Id.* at 19.) Appellant reached over and locked the office door, and S.T. testified that she was thinking, "Oh, my God, how am I going to get out of this?" (*Id.*) Appellant grabbed S.T.'s hand and tried to get her to touch his penis. (*Id.* at 20.) S.T. testified that she wanted to leave but the door was locked. (*Id.* at 19.) In an effort to get appellant to stop, S.T. told him that they should go to a hotel. (*Id.* at 19-21.) S.T. figured that maybe if she said they could go to a hotel, he would stop and let her leave. (*Id.* at 21.) Appellant replied, "That sounds good," and put his penis back in his pants. (*Id.*) When she got home, appellant called her and asked when they were going to the hotel. (*Id.* at 22.) S.T. responded that she was married and asked appellant what he was doing. (*Id.*) S.T. reported the incident to a manager at Central and later contacted authorities. (*Id.* at 26.) Eventually, appellant was fired from Central as a result of his sexual misconduct. (Notes of testimony, 3/24/15 at 91.) None of the three victims, S.T., D.J., and L.H., knew each other

prior to these incidents. (Notes of testimony, 3/23/15 at 123-124; 3/24/15 at 214; 3/25/15 at 30-31.)

All three cases were joined for trial; appellant's pre-trial motion to sever was denied. Following a five-day jury trial, appellant was found guilty of one count of rape by forcible compulsion, two counts of involuntary deviate sexual intercourse ("IDSI") by forcible compulsion, two counts of sexual assault, two counts of indecent assault, and one count of criminal attempt to commit indecent assault.[4] On March 2, 2016, appellant received an aggregate sentence of 25 to 62 years' incarceration. This timely appeal followed. Appellant has complied with Pa.R.A.P. 1925(b), and the trial court has filed a Rule 1925(a) opinion.

Appellant has raised the following issues for this court's review:

> I. Was the evidence sufficient to sustain appellant's convictions for rape by forcible compulsion and [IDSI] where the Commonwealth's evidence failed to establish that appellant used physical force, the threat of physical force or psychological coercion while committing the alleged acts of sexual intercourse?
>
> II. Did the trial court err in failing to permit appellant to cross-examine complainant [L.H.] about the fact that she had previously filed a lawsuit against a psychologist for engaging in inappropriate sexual behavior with her?
>
> III. Did the trial court violate appellant's right of confrontation when it prevented his attorney

---

[4] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3124.1, 3126(a)(1), and 901(a), respectively.

> from cross-examining [D.J.] after she testified at appellant's sentencing hearing?
>
> IV.    Did the trial court err in denying appellant's pre-trial motion to sever the cases against him involving three separate complainants?

Appellant's brief at 5 (capitalization deleted).

In his first issue on appeal, appellant argues that the evidence was insufficient to prove the element of forcible compulsion.[5]  Appellant argues that he did not use physical force or psychological coercion to compel his victims to engage in sexual activity.  We disagree.

The Crimes Code defines rape, in relevant part, as follows:

> **(a)    Offense defined.--**A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant:
>
> (1)    By forcible compulsion.
>
> (2)    By threat of forcible compulsion that would prevent resistance by a person of reasonable resolution.

18 Pa.C.S.A. § 3121(a).

> In reviewing sufficiency of evidence claims, we must determine whether the evidence admitted at trial,

---

[5] In his Rule 1925(b) statement, appellant limited his argument to the rape conviction.  (Rule 1925(b) statement, 5/4/16 at 1 ¶1; docket #53.) Therefore, appellant's argument that the evidence was also insufficient to prove IDSI is waived on appeal.  Pa.R.A.P. 1925(b)(4)(vii); **see also Commonwealth v. Marion**, 981 A.2d 230, 237 (Pa.Super. 2009), **appeal denied**, 990 A.2d 729 (Pa. 2010) ("to preserve their claims for appellate review, [a]ppellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to [Rule] 1925.  Any issues not raised in a [Rule] 1925(b) statement will be deemed waived." (citations omitted)).

and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all the elements of the offense. *Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa.Super. 2003). Additionally, to sustain a conviction, the facts and circumstances which the Commonwealth must prove, must be such that every essential element of the crime is established beyond a reasonable doubt. *Commonwealth v. Hargrave*, 745 A.2d 20, 22 (Pa.Super. 2000), *appeal denied*, 563 Pa. 683, 760 A.2d 851 (2000). Admittedly, guilt must be based on facts and conditions proved, and not on suspicion or surmise. *Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 636 A.2d 1173 (1994). However, entirely circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. *See id.*; *see also Commonwealth v. Chmiel*, 536 Pa. 244, 247, 639 A.2d 9, 11 (1994).

*Commonwealth v. Eckrote*, 12 A.3d 383, 385-386 (Pa.Super. 2010).

Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *See Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa.Super. 2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). The fact finder is free to believe all, part, or none of the evidence presented at trial. *See Commonwealth v. Nicotra*, 425 Pa.Super. 600, 625 A.2d 1259, 1261 (1993).

*Id.* at 386.

It is well-established that in order to prove the "forcible compulsion" component, the Commonwealth must establish, beyond a reasonable doubt, that the defendant "used either physical force, a threat of physical force, or psychological coercion, since the mere showing of a lack of consent does not support a conviction for rape . . . by forcible compulsion." *Commonwealth v. Brown*, 556 Pa.

131, 136, 727 A.2d 541, 544 (1999). In **Commonwealth v. Rhodes**, 510 Pa. 537, 510 A.2d 1217 (1986), our Supreme Court stated that forcible compulsion includes "not only physical force or violence, but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will." **Rhodes**, 510 Pa. at 555, 510 A.2d at 1226. Further, the degree of force required to constitute rape is relative and depends on the facts and particular circumstances of a given case. **Commonwealth v. Ruppert**, 397 Pa.Super. 132, 579 A.2d 966, 968 (1990), **appeal denied**, 527 Pa. 593, 588 A.2d 914 (1991). **See** Pennsylvania Benchbook on Crimes of Sexual Violence, Ch. 2, pg. 27 (2d Edition 2009).

**Id.** at 387.

Whether a defendant did or did not resort to forcible compulsion [§ 3121(1)] or the threat of forcible compulsion sufficient to prevent resistance by a person of reasonable resolution [§ 3121(2)] is a determination to be made in each case based upon the totality of the circumstances.

> Significant factors to be weighed in that determination would include the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress. This list of possible factors is by no means exclusive.

**Commonwealth v. Titus**, 556 A.2d 425, 427 (Pa.Super. 1989), quoting

**Rhodes**, 510 A.2d at 1226.

The charge of rape by forcible compulsion related to the allegations involving D.J. (Criminal Information, 2/11/13 at 1; docket #3.) As described above, D.J. testified that on each of the four separate occasions that she was assaulted by appellant, he locked the door to his office. (Notes of testimony, 3/24/15 at 178, 182, 193, 202.) During the second incident, appellant grabbed D.J.'s hand and placed it on his penis. (*Id.* at 187.) He also had both hands on the back of her head as he forced his penis into her mouth. (*Id.* at 188.)

During the third incident, appellant pulled up D.J.'s overgarments, bent her over the desk, and entered her from behind. (*Id.* at 194.) D.J. testified that it was painful. (*Id.* at 196.) During the fourth and final assault, D.J. testified that appellant was grinding against her while her back was to the office door. (*Id.* at 202.) D.J. testified that part of the door was sticking into her back and it hurt. (*Id.* at 203.) D.J. tried to push him away, but was unable to because she had a broken wrist and did not have her full strength. (*Id.* at 205.) Appellant then proceeded to force his penis into D.J.'s mouth before penetrating her vaginally from behind. (*Id.* at 208-209.) Therefore, appellant's argument that he did not use any physical force is not supported by the testimony.

Furthermore, the jury could reasonably find that appellant used psychological force to compel D.J. to engage in sexual intercourse. As the trial court observed, D.J. was an emotionally vulnerable woman with a

history of childhood sexual abuse. (Trial court opinion, 6/8/16 at 8.) Appellant knew that D.J. had been sexually abused as a child from age five until age twelve. (Notes of testimony, 3/24/15 at 173.) D.J. was also unemployed and looking for work. (*Id.* at 171.) Appellant told D.J. that she had potential and that he was going to get her a job and help get her life back together. (*Id.* at 173.) D.J. described appellant as charismatic. (*Id.*) Appellant would lure her into his office with promises to help improve her resume or find her suitable housing. (*Id.* at 174-175, 201.)

Ultimately, appellant used his position of trust and authority to take advantage of the weak and fragile victim. Appellant was supposed to help D.J., and instead he repeatedly sexually assaulted her. D.J. testified that she never went to Central for the purpose of meeting with appellant. (*Id.* at 180.) All of her appointments were with other people. (*Id.*) Appellant would find her in the lobby or in the hallway and take her into his office, close and lock the door, and then sexually assault her. (*Id.* at 174-175, 181, 192.) The fourth time, appellant actually pulled her out of her "rape group," ostensibly to show her some papers related to finding a place to live. (*Id.* at 200-201.) Appellant then proceeded to rape the victim orally and vaginally. (*Id.* at 208-209.) D.J. testified that she said "no" and tried to escape and push him away, to no avail. (*Id.* at 204-206.) D.J. testified that she "felt really stupid" and wanted to kill herself. (*Id.* at 207, 209.) This was sufficient for the jury to conclude that appellant used both

physical and psychological coercion to force the victim, D.J., to engage in sexual intercourse. Appellant's sufficiency claim fails.

Next, appellant complains that he should have been permitted to question L.H. about an alleged prior lawsuit she filed against a psychologist for inappropriate sexual contact which resulted in a settlement. Appellant claims that the fact L.H. filed a prior lawsuit on similar grounds went to improper motive and credibility. The trial court denied permission to pursue this line of questioning as appellant failed to comply with the procedural requirements of the Rape Shield Law. Furthermore, the trial court determined that the matter was irrelevant. (Notes of testimony, 3/24/15 at 44-47.)

Pennsylvania's Rape Shield Law, 18 Pa.C.S.A. § 3104, provides as follows:

> **(a)** **General rule.--**Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.
>
> **(b)** **Evidentiary proceedings.--**A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the

> motion and offer of proof are sufficient on their faces, the court shall order an **in camera** hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S.A. § 3104.

> Our standard of review of a trial court's ruling on the admissibility of evidence is limited.

> > A trial court's ruling on the admissibility of evidence of the sexual history of a sexual abuse complainant will be reversed only where there has been a clear abuse of discretion. 'An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.'

> > **Commonwealth v. Allburn**, 721 A.2d 363, 366 (Pa.Super. 1998), **appeal denied**, 559 Pa. 662, 739 A.2d 163 (1999) (citations omitted), quoting **Commonwealth v. Spiewak**, 533 Pa. 1, 7, 617 A.2d 696, 699 (1992).

**Commonwealth v. Burns**, 988 A.2d 684, 689 (Pa.Super. 2009), **appeal denied**, 8 A.3d 341 (Pa. 2010).

> The purpose of the Rape Shield Law is to prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim. **Allburn**, 721 A.2d at 366-367. The Rape Shield Law is intended to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants. **See Commonwealth v.**

> *Riley*, 434 Pa.Super. 414, 643 A.2d 1090, 1093 (1994).

*Id.* (footnote omitted).

> The text of the statute includes one specific exception to its general prohibition of past sexual conduct evidence, regarding the victim's sexual conduct with the defendant where consent of the alleged victim is at issue and the evidence is otherwise admissible. 18 Pa.C.S.A. § 3104(a). However, via interpretive efforts by the courts of this Commonwealth, the Rape Shield Statute has been found to bow to the following exceptions: (1) evidence that negates directly the act of intercourse with which a defendant is charged; (2) evidence demonstrating a witness' bias or evidence that attacks credibility; and (3) evidence tending to directly exculpate the accused by showing that the alleged victim is biased and thus has motive to lie, fabricate, or seek retribution via prosecution. *Allburn*, 721 A.2d at 367.

*Burns*, 988 A.2d at 690.

If, as the trial court found, the proposed evidence that L.H. had filed a previous lawsuit against a mental health professional claiming sexual assault implicated the Rape Shield Law, then the issue was waived for counsel's failure to file a written motion and offer of proof prior to trial. *Burns*, 988 A.2d at 690 ("We have repeatedly stated that a defendant who desires to introduce evidence of the victim's prior sexual conduct must file a written motion and make a specific offer of proof prior to trial." (citations omitted)). Appellant did not raise the issue until the second day of trial, during his cross-examination of L.H. (Notes of testimony, 3/24/15 at 44.)

Appellant argues that the proffered evidence goes to bias and improper motive. According to appellant, it demonstrates a pattern of suing mental health professionals alleging inappropriate sexual conduct for financial gain. (*Id.*) The Rape Shield Law may not be used to exclude relevant evidence showing a witness' bias, motive to fabricate, or attacking credibility. In addition, there is authority for the proposition that evidence that the victim was subject to a previous sexual assault does not reflect upon the victim's reputation for virtue or chastity and is not the victim's own conduct, and therefore, the Rape Shield Law does not apply. *Commonwealth v. Holder*, 815 A.2d 1115, 1118 (Pa.Super. 2003), *appeal denied*, 827 A.2d 430 (Pa. 2003); *Commonwealth v. Johnson*, 638 A.2d 940 (Pa. 1994). Whether L.H. was a plaintiff in a prior lawsuit alleging sexual assault does not call her chastity into question.

That does not end the inquiry, however, because the trial court also excluded the evidence on the basis that it was a collateral issue and irrelevant. (*See* trial court opinion, 6/8/16 at 12 (". . . [L.H.]'s previous lawsuit claiming sexual assault against a mental health professional, i.e., a past accusation[] against a third part[y] is collateral; it does not bear on the ultimate question, which was whether [appellant] sexually assaulted the victim.").) On this point, we agree. Even if L.H. had filed a previous lawsuit against another mental health professional alleging sexual misconduct, it would not make it more or less likely that appellant committed the offenses

charged. **See Holder**, 815 A.2d at 1119-1120 (evidence was properly excluded as irrelevant and collateral because a previous allegation that a third party sexually assaulted the victim did not bear directly on whether or not appellant did); Pa.R.E. 402. The issue, therefore, was collateral; and L.H. could not be impeached with it. **Id.** at 1120.[6]

Next, appellant complains that he was not permitted to cross-examine D.J. at sentencing. Appellant argues that this was in violation of his constitutional right of confrontation. We disagree.

The Crime Victims Act, 18 P.S. § 11.101 **et seq.**, gives victims of crime the right to submit an oral and/or written victim impact statement at sentencing:

> Victims of crime have the following rights:
>
> > To have opportunity to offer prior comment on the sentencing of a defendant or the disposition of a delinquent child, to include the submission of a written and oral victim impact statement detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. The written statement shall be included in any predisposition or presentence report submitted to the court. Victim-impact statements shall be considered by a court when determining the disposition of a juvenile or sentence of an adult.

---

[6] There was testimony at trial that L.H. had filed a civil lawsuit against Central and appellant and that the matter settled out of court. (Notes of testimony, 3/23/15 at 81-82; 3/24/15 at 42-43.)

18 P.S. § 11.201(5).

At sentencing, D.J. read a prepared statement into the record. (Notes of testimony, 3/2/16 at 34-37.) The Commonwealth did not ask D.J. any questions. (*Id.*) The trial court indicated that if the Commonwealth asked D.J. any questions, appellant would be permitted to cross-examine. (*Id.* at 34.) However, since D.J. simply read from her written statement, the trial court denied appellant's request to examine the witness. (*Id.* at 37-38.)

Appellant has cited no authority for the proposition that when a victim of a crime chooses to read a prepared victim impact statement into the record at the defendant's sentencing and is not asked any questions by the Commonwealth, the defendant has a right to examine the victim, nor is this court aware of any. As the trial court remarked, D.J. could have simply submitted her victim impact statement in writing, and there would be no opportunity for cross-examination under such circumstances. (Trial court opinion, 6/8/16 at 12.) This claim fails.[7]

Finally, appellant contends that the trial court abused its discretion in denying his motion to sever the offenses.

> Whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice

---

[7] At any rate, it appears that appellant wanted to question D.J. about her statement that she now has a criminal record. (Notes of testimony, 3/2/16 at 36.) Appellant claimed that this statement "opened up the door" to questioning. (*Id.* at 37-38.) The Commonwealth then stipulated to the fact that D.J. was on probation for retail theft and possession of a controlled substance. (*Id.* at 38.)

and clear injustice to the defendant. ***Commonwealth v. Newman***, 528 Pa. 393, 598 A.2d 275, 277 (Pa. 1991). The Rules of Criminal Procedure provide:

Joinder-Trial of Separate Indictments of Informations

(A)    Standards

    (1)    Offenses charged in separate indictments or informations may be tried together if:

        (a)    the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

        (b)    the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1)(a)-(b).

***Commonwealth v. Wholaver***, 989 A.2d 883, 898 (Pa. 2010).

The Pennsylvania Rules of Criminal Procedure provide that distinct offenses which do not arise out of the same act or transaction may be tried together if the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion. Pa.R.Crim.P. 582(A)(1)(a). While evidence concerning distinct crimes is inadmissible solely to demonstrate a defendant's bad character or his propensity to commit crimes, that evidence will be permitted to establish the identity of the perpetrator where proof of one crime tends to prove the others. ***Commonwealth v. Cousar***, 593 Pa. 204, 225, 928 A.2d 1025, 1037 (2007).

***Commonwealth v. Stiles***, 143 A.3d 968, 975-976 (Pa.Super. 2016),

***appeal denied***, ___ A.3d ___, 2016 WL 7106404 (Pa. 2016) (footnote

omitted).

> Evidence of distinct crimes is inadmissible solely to demonstrate a defendant's criminal tendencies. Such evidence is admissible, however, to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others. This will be true when there are shared similarities in the details of each crime.

***Commonwealth v. Andrulewicz***, 911 A.2d 162, 168 (Pa.Super. 2006),

***appeal denied***, 926 A.2d 972 (Pa. 2007), quoting ***Commonwealth v.***

***Keaton***, 729 A.2d 529, 537 (Pa. 1999) (internal citations omitted). "The

following factors should be considered in establishing similarity: the elapsed

time between the crimes; the geographical proximity of the crime scenes;

and the manner in which the crimes were committed." ***Commonwealth v.***

***Judd***, 897 A.2d 1224, 1232 (Pa.Super. 2006), ***appeal denied***, 912 A.2d

1291 (Pa. 2006) (citations omitted) (bullets omitted).

> In [***Commonwealth v.***] ***Newman***[, 598 A.2d 275 (Pa. 1991)], the Pennsylvania Supreme Court held that consolidation was proper where: 1) both rapes occurred in the x-ray department; 2) each occurred late at night when appellee was the only technician on duty; 3) both victims were females suffering from head injuries; 4) both victims were half the size of appellee; 5) appellee began kissing the victims, hugging the victims, and fondling the victims' breasts before climbing onto the examination table and raping them. ***Newman***, 598 A.2d at 278.

*Commonwealth v. Smith*, 47 A.3d 862, 867 (Pa.Super. 2012), *appeal denied*, 60 A.3d 536 (Pa. 2012). Similarly, in *Smith*, this court determined that the details of the two assaults were substantially similar, warranting consolidation, where, *inter alia*: both victims were 12-years-old at the time of the crime; they were both of Hispanic race; they both had a close personal relationship with the defendant; both victims were assaulted in their residence; both victims reported the assaults involved vaginal penetration; and both assaults occurred in a two-month time period. *Id.* at 868-869. This court also found that the evidence of each offense was capable of separation by the jury so that there was no danger of confusion and that the defendant was not unduly prejudiced by consolidation. *Id.* at 869.

In the case *sub judice*, there were numerous and substantial similarities between all three cases. All three female victims experienced childhood sexual abuse and other trauma, which appellant exploited for his own sexual gratification. The offenses all occurred over a three-month time period in appellant's office at Central. Two of the victims, L.H. and D.J., were seeking assistance at Central with mental health issues and housing/employment. The third victim, S.T., was applying for a position as a certified peer specialist at Central. There was evidence that appellant used his position of trust and authority as a peer specialist team leader to exploit

these women sexually. Furthermore, his conduct progressed over time, from exposing himself, to oral sex, to vaginal intercourse.

As in **Smith**, appellant points out some relatively minor differences, **e.g.**, that S.T. and D.J. were African-American, while L.H. was Caucasian. (Appellant's brief at 38.) The victims' ages ranged from 34-years-old (D.J.) to 51-years-old (L.H.). (**Id.**) L.H. and D.J. were clients of Central, while S.T. was applying to work as a counselor at the facility. (**Id.**) Appellant also argues that only D.J. alleged that appellant engaged in both oral and vaginal intercourse with her, and S.T. testified that appellant only asked her to touch his exposed penis. (**Id.** at 39.) Appellant's conduct varied with each victim.

The defendant in **Smith** similarly relied on such relatively minor distinctions, and this court rejected the argument, stating, "We find that the similarities between the [] assaults substantially outweigh their slight differences, and that those similarities adequately support the trial court's consolidation of the two cases." **Smith**, 47 A.3d at 869. In the same vein, in this case, we agree with the trial court that the many similarities among the three cases, including location (at Central, in appellant's office), time (a three-month time span), conduct (exposing his penis through the zipper of his pants), and the diminished capacity of the victims (history of childhood sexual abuse), made consolidation of the three cases appropriate.

The evidence of each of the offenses would be admissible in a separate trial for the other, to establish appellant's identity and also as proof of a common plan, scheme, or design. (Trial court opinion, 6/8/16 at 17.) In addition, the evidence was capable of separation by the jury so that there was no danger of confusion, and the probative value of the evidence outweighed its prejudicial effect. (*Id.*) The trial court did not abuse its discretion in consolidating the matters for trial.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/15/2017