J-S45012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SAGE NATHANIEL LEE KENT | : | |
| | : | |
| Appellant | : | No. 2480 EDA 2016 |

Appeal from the Judgment of Sentence July 11, 2016
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0008036-2015

BEFORE: GANTMAN, P.J., PANELLA, J., and STRASSBURGER, J.*

MEMORANDUM BY GANTMAN, P.J.: **FILED SEPTEMBER 06, 2017**

Appellant, Sage Nathaniel Lee Kent, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas, following his bench trial convictions of two counts each of robbery and aggravated assault, and one count each of recklessly endangering another person ("REAP"), firearms not to be carried without a license, and possessing instruments of crime ("PIC").[1] We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them.

---

[1] 18 Pa.C.S.A. §§ 3701(a)(1), 2702(a), 2705, 6106(a)(2), and 907(b), respectively.

---

*Retired Senior Judge assigned to the Superior Court.

Appellant raises the following issue for our review:

DID THE TRIAL COURT ABUSE ITS DISCRETION IN DETERMINING THAT APPELLANT'S CONVICTION WAS NOT CONTRARY TO THE WEIGHT OF THE EVIDENCE, WHERE IT WAS MANIFESTLY UNREASONABLE FOR THE TRIAL COURT TO BASE APPELLANT'S CONVICTION UPON CONTRADICTORY, SELF-SERVING TESTIMONY OF ONE IDENTIFICATION WITNESS?

(Appellant's Brief at 5).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Gail A. Weilheimer, we conclude Appellant's issue on appeal merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (**See** Trial Court Opinion, filed January 11, 2017, at 6-13) (finding: Victim and Detective Leeds credibly explained reason for Victim's delayed identification of Appellant as shooter; Victim testified he did not initially identify Appellant for fear of being labeled "snitch" in community and alerting police to his involvement in drug activity; Victim explained he eventually chose to identify Appellant as shooter because Victim feared for his safety and safety of his family; Corporal Gergel also testified for Commonwealth at trial; specifically, Corporal Gergel stated Victim's initial description of shooter was consistent with Victim's later identification of Appellant as shooter; additionally, Danielle Hawkins' description of men fleeing crime scene was consistent with Victim's initial description of shooter and subsequent identification of Appellant as shooter; further, Victim's

- 2 -

identification of Appellant in photo array, recognition of Appellant's accent, and recollection of Appellant's gold teeth, lent credibility to Victim's implication of Appellant as shooter; in light of this evidence, court determined Victim's identification of Appellant as shooter was highly credible; in contrast, court found Appellant's testimony about incriminating text messages highly incredible; as finder of fact, court was free to disbelieve Appellant's explanation; under these circumstances, Appellant's conviction was not against weight of evidence, and court properly denied Appellant's post-sentence motion challenge to weight of evidence). The record supports the trial court's reasoning, and we see no reason to disturb its decision to deny relief on Appellant's challenge to the weight of the evidence. *See Commonwealth v. Champney*, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (stating where trial court has ruled on weight claim, appellate court's review is limited to whether trial court palpably abused its discretion in ruling on weight claim). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/6/2017

- 3 -

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | Common Pleas Court No.: |
| | : | CR-8036-2015 |
| v. | : | |
| | : | Superior Court No.: |
| SAGE KENT | : | 2480 EDA 2016 |
| | : | |

## OPINION

**WEILHEIMER, J.**                                                     **January 11th, 2017**

Appellant, Sage Kent (Defendant in the underlying matter), has appealed his conviction after he was found guilty by the undersigned beyond a reasonable doubt. Appellant argues the trial court abused its discretion in denying him either a new trial or a finding of not guilty. Specifically, Appellant alleged his guilty verdict was against the weight of the evidence, as minor victim, J.M. (          ) ("Victim"), failed to identify the Appellant immediately after the incident. For the reasons that follow, the trial court was within its discretion in finding Appellant's guilty verdict was not against the weight of evidence and its subsequent denial of a new trial should be affirmed.

### FACTUAL HISTORY

The relevant facts of this case, as found by the trial court, are as follows: On October 3, 2015, around 9:00 P.M. in Norristown, Pennsylvania, Appellant and another person followed Victim as he was walking home down Jacoby Street after selling marijuana to a friend. *See* Trial Ct. Tr. at 35-38, 45, 51, April 20, 2016. Shortly after Victim noticed he was being followed, Appellant said to Victim, "Run your pockets," indicating to Victim to empty his pockets. *Id.* at 35, 38-39. Victim turned around, recognized Appellant's face and bottom gold teeth, saw Appellant pull out a gun from his waistband, and began to run toward Arch Street. *See id.* at 34-35, 38-39, 40:6-10, 41:2-4, 42:2-13, 45:21-25. *See also id.* at 107 (Appellant admitted he had his gold teeth at time of the incident.) Appellant then shot Victim in the back while he was running away. *See id.* at 38, 44. Victim made his way back to 819 Green Street, where his girlfriend's family lived, and laid down in the street upon realizing he was, in fact, shot. *Id.* at 47.

Corporal Eric Gergel arrived at the scene shortly thereafter, and spoke with Appellant.[1] *See id.* at 14, 16-17, 57. At that time, Appellant was not initially asked for an identification of any persons, but Appellant offered that he was shot and gave a limited description of Appellant and the other person. *See id.* at 17, 20, 24:14-16. Specifically, Victim told Corporal Gergel the two men were young black males wearing dark clothing and that one of them had a fur hat on. *See id.* at 18:2-5. An ambulance was called, and Victim was transported to Penn Presbyterian Medical Center for treatment. *Id.* at 47-48. Victim underwent surgery and was released four days later, on October 8, 2015. *Id.* at 48-49.

On October 4, 2015, the day after the shooting, Victim gave his first statement to a Detective Crawford and a Corporal Dumas while in the hospital, but did not identify Appellant as the person who shot him at that time. *Id.* at 51, 57. Victim, however, indicated one person had a dark hoodie and the other had a tan hoodie. *Id.* at 59-60. At that time, Victim was afraid of being labeled a "snitch," which according to Victim, as well as Detective Charles Leeds, is an undesirable label for Victim for a couple of reasons. *See id.* at 52, 64-65 (Victim), 93 (Detective Leeds). Firstly, a snitch in Norristown is generally someone who cannot be trusted. *Id.* at 52. Secondly, it would be bad for Victim's marijuana business. *Id.* at 51, 65. Thirdly, in Norristown, it is a "bad thing" to speak with police. *Id.* at 65. And fourthly, the label of snitch "has affected previous investigations and ongoing investigations." *Id.* at 93 (Detective Leeds).

On October 15, 2015, Victim, then out of the hospital, gave his second statement, this time to Detective Leeds, and made the first direct identification of Appellant as the shooter out of a sequential photographic array ("photo array"). *Id.* at 53, 60-61, 73-74. Between the time of Victim's first and second statement to the police, his fear of being labeled a snitch was transcended by the fear of Appellant further endangering him or his family if he remained at large. *Id.* at 53-54. Victim picked Appellant out of the carefully crafted photo array of eight (8) similar-looking individuals, including Appellant, which

---

[1] Patrol officer, Bryan Nawoschik, another first responder to the scene, eventually collected Victim's clothing, which contained a bullet hole and the Victim's blood on it. *See id.* at 26-31, 47.

2

was prepared by Detective Leeds. *Id.* at 74-75, 78. Before being presented the photo array, Victim was given the instruction, *inter alia,* that even if he recognized anyone he was "to continue to look at every single photo in that photographic array." *Id.* at 77.

On October 20, 2015, Appellant was arrested as a suspect after Victim's first identification of Appellant. *Id.* at 79:10-12, 80:13-16. Upon arrest, Appellant gave the police consent to search his cell phone. *Id* at 79:19-21, 80:2-12. In reviewing Appellant's September 24, 2015, text message conversation between him and his girlfriend, Satin Williams, which occurred approximately one week prior to the shooting, the police found "text messages of substance" evincing Appellant's involvement in the shooting. *See id.* at 81-84. The text messages regarded a "strizzy," and the purchase of a "new clip," and "2 box [sic] of bullets," which referred to a .40 caliber handgun and a magazine. *Id.* at 85-91. Appellant gave highly incredible evidence regarding these text messages, such that he never texted his girlfriend about bullets or a gun, that it was someone else that used his phone and texted another person that was labeled as his girlfriend, though not actually her. *Id.* at 107.

Victim's testimony at trial that Appellant and the other person were wearing hoodies and one was wearing a hat paralleled what he originally told Corporal Gergel right after the shooting, and was also corroborated by the witness, Danielle Hawkins, who saw Appellant and the other person running down Jacoby Street after the shooting. *See id.* at 54-55 (Victim), 68-70 (Danielle Hawkins). Victim also testified he was familiar with Appellant because he met him previously through a friend, and encountered him previously, "Over 20 times," including in the area of the shooting. *Id.* at 39:14-25, 40:24-25, 41:2-4, 51. Victim was familiar with the way in which Appellant spoke to him, as it was not a typical Norristown accent. *Id.* at 40:14-23. Detective Leeds corroborated that Appellant spoke with almost a "southern drawl," peculiar to Norristown. *Id.* at 92:18-20. Detective Leeds' testimony regarding Appellant's physical characteristics, including his bottom gold teeth likewise matched the descriptions given by both Victim and witness, Danielle Hawkins. *See id.* at 18, 34, 40, (Victim), 70 (Danielle Hawkins), 92, 101 (Detective Leeds).

3

# PROCEDURAL HISTORY

On November 5, 2015, a Criminal Complaint and Affidavit of Probable Cause was filed, which included investigatory details regarding the shooting incident that occurred on October 3, 2015, and Victim's identification of Appellant out of a sequential photographic array. On January 19, 2016, the Bill of Information was filed, charging Appellant with eight (8) different counts: two (2) counts of Aggravated Assault, one (1) count of Recklessly Endangering Another Person, one (1) count of Firearms Not to be Carried Without a License, three (3) counts of Robbery, and one (1) count of Possession of a Firearm with Intent to Employ Criminally. On April 6, 2016, a two (2) day jury trial was scheduled to commence on April 20, 2016.

On April 20, 2016, Appellant was informed prior to the start of jury selection, *inter alia*, that a jury would be chosen from members of the community thereby producing a jury of peers, a verdict rendered by a jury must be unanimous, and Appellant would be permitted to participate in the selection of the jury panel. (*See* Waiver of Jury Trial, April 20, 2016.) Thereafter, Appellant knowingly and intelligently waived his right to a jury trial and elected to be tried by the undersigned. (*Id.*) On the same day, Appellant was tried and found guilty beyond a reasonable doubt of Counts 1, 2, 3, 5, 6, and 7; namely, both counts of Aggravated Assault, Reckless Endangerment of Another Person, two (2) counts of Robbery (Robbery by Threats and Robbery by Fear of Bodily Injury), and Possession of a Firearm with the Intent to Employ Criminally. (*See* Disposition – Deferred Sentence, April 20, 2016.) On the same day, the trial court granted the Commonwealth's motion to *nol pros* the remaining counts against Appellant. (*Id.*) On July 11, 2016, Appellant was sentenced on Count 1 – Aggravated Assault to undergo imprisonment for not less than two-and-a-half (2 ½) years nor more than five (5) years in a State Correctional Institution, commitment to date from October 20, 2015, and to pay costs of prosecution; and was given no further penalty on the remaining counts of which he was found guilty. (*See* Disposition – Corrected, July 11, 2016.) Appellant was also ordered to have no contact with Victim or his family. (*Id.*)

4

On July 15, 2016, Appellant filed a Post-Sentence Motion, alleging his guilty conviction was against the weight of evidence[2], the two identifications made by Victim were insufficient to prove beyond a reasonable doubt that Appellant was guilty of shooting Victim, and there was not any other corroborating identification evidence. (*See* Appellant's Post-Sentence Motion.) On July 27, 2016, upon consideration of said Post-Sentence Motion, the trial court denied relief, as the weight of evidence proved Appellant was guilty of shooting Victim beyond a reasonable doubt, including the supporting evidence from the witness, Danielle Hawkins, and by Detective Leeds, as stated in the Factual History section, *supra*. (*See* Trial Ct. Order, July 27, 2016.)

On August 2, 2016, Appellant filed his Notice of Appeal, *pro se*, despite being still represented by counsel. (Notice of Appeal.) On October 6, 2016, the trial court ordered Appellant to file his Concise Statement of Matters Complained of On Appeal ("Concise Statement") pursuant to Pennsylvania Rules of Appellate Procedure (Pa. R.A.P.), Rule 1925(b). (Trial Ct. Order, October 6, 2016.) On October 20, 2016, Assistant Public Defender, Seth Grant, Esquire, asked the trial court for a thirty (30) day extension to file Appellant's Concise Statement, which the trial court granted on October 24, 2016.

On November 23, 2016, Appellant's Concise Statement was filed, alleging the following:

> 1. THE VERDICT OF GUILT WAS AGAINST THE WEIGHT OF THE EVIDENCE INSOFAR AS IMMEDIATELY AFTER THE INCIDENT THE VICTIM FAILED TO IDENTIFY THE DEFENDANT. THE VICTIMS [SIC] SUBSEQUENT IDENTIFICATION OF THE DEFENDANT FROM A PHOTO ARRAY AND IN OPEN COURT WERE INSUFFICIENT TO ESTABLISH THE APPELLANT'S GUILT BEYOND A REASONABLE DOUBT TO THESE OFFENSES BECAUSE OF THE AFOREMENTIONED FAILURE TO IDENTIFICATION OF THE APPELLANT BY THE VICTIM.

(Concise Statement, November 23, 2016.)

---

[2] Thus, preserving this issue for appeal. *See* Pa. R. Crim. P., Rule 607(A); *see also Commonwealth v. Lofton*, 57 A.3d 1270, (Pa. Super. 2012), *appeal denied* 69 A.3d 601, *appeal after new sentencing hearing* 131 A.3d 98, *appeal denied* 130 A.3d 1288. ("A weight-of-the-evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing.")

5

# DISCUSSION

## I. STANDARD OF REVIEW

In the instant matter, the Superior Court of Pennsylvania ("Superior Court") "may only reverse the [trial] court's verdict if it is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Lofton*, 57 A.3d 1270, 1273 (Pa. Super. 2012). Yet, "[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (citing *Commonwealth v. Brown*, 648 A.2d 1177, 1189 (Pa. 1994).) Thus, "[a]ppellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Commonwealth v. Hunzer*, 868 A.2d 498 (Pa. Super. 2005), *reargument denied, appeal denied* 880 A.2d 1237 (Pa. 2005); *see also Commonwealth v. Cousar*, 928 A.2d 1025 (Pa. _ ˙ 2007), *certiorari denied*, 171 L.Ed.2d 235 (2008) ("relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.")

More specifically, '[t]he test is not whether the [appellate] court would have decided the case in the same way but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail." *Commonwealth v. Taylor*, 471 A.2d 1228, 1230 (Pa. Super. 1984) (citations omitted); *see also Commonwealth v. Lofton*, 57 A.3d 1270, 1273 (Pa. 2012) ("so contrary to the evidence as to shock one's sense of justice"). In analyzing the verdict in this way, the Superior Court must consider the fact finder, whether it is a jury or a judge, "is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *See Cousar*, 928 A.2d at 1036. Therefore, "[t]he trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Id.* (citing *Commonwealth v. Keaton*, 729 A.2d 529, 540-41 (Pa. 1999).)

## II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S POST-TRIAL MOTION FOR A NEW TRIAL BECAUSE DEFENDANT'S GUILTY VERDICT WAS NOT CONTRARY TO THE WEIGHT OF EVIDENCE.

"A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Widmer*, 744 A.2d at 751 (citing *Commonwealth v. Whiteman*, 485 A.2d 459 (Pa. 1984).) The Appellant is therefore limited on appeal in his argument that the guilty verdict in this matter was against the weight of evidence; the only issue on appeal is "whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail." *See Taylor*, 471 A.2d at 1230.

"An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Widmer*, 744 A.2d 751-52 (citing *Commonwealth v. Brown*, 648 A.2d 1177 (Pa. 1994).) "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* (citation omitted). This is true because "[t]he trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Hunter*, 768 A.2d 1136 (Pa. Super. 2001), *appeal denied*, 796 A.2d 979 (Pa. 2001). Thus, a trial judge must determine "notwithstanding all the facts, [whether] certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.*

In *Lofton*, the Superior Court employed the above standard of review when it analyzed, *inter alia*, the trial court's denial of the defendant's motion for a new trial, based upon his claim the verdict was "not supported by the greater weight of the evidence." *See Lofton, supra.* Specifically, the Superior Court analyzed discrepancies among the out-of-court statements and in-court testimony regarding identification of the defendant, which were the gravamen of the defendant's weight-of-evidence claim. *See id.* at 1272. The one witness in *Lofton*, Terrance Farley, was under arrest when he identified the defendant as the shooter to police, and later at trial denied ever implicating the defendant. *Id.* Another witness, J.D.,

7

resided in a juvenile facility when he identified the defendant, and admitted his own presence at the scene of the crime. *Id.* J.D., too, denied ever implicating the defendant at trial. *Id.* The *Lofton* court opined as follows:

> Assuming *arguendo* that [the] [a]ppellant preserved the issue, we agree with the Commonwealth that it does not entitle him to relief. The jury was clearly apprised of the discrepancies between the out-of-court statements and the in-court testimony both of J.D. and Mr. Farley. [The] [a]ppellant thoroughly explored the police tactics in securing the statements and attempted to highlight, via questioning of police, the possibility that the investigators did not actually transcribe verbatim the statements provided by the witnesses. The jury, nevertheless, was free to reject the in-court testimony of J.D. and Mr. Farley and accept the testimony of police that they accurately transcribed the statements that they were provided as well as the veracity of the out-of-court statements.
>
> Moreover, while the additional witnesses could not conclusively identify [the appellant] or his co-defendants, their testimony was consistent with other information provided by J.D. [...]

*Lofton*, 57 A.3d at 1275 (emphasis in original). Thus, the Superior Court ultimately determined the trial court did not abuse its discretion in ruling that the guilty verdict was not against the weight of evidence. *Id.*

In the instant matter, the Superior Court will employ the same standard of review as in *Lofton*, as there is a similar weight-of-evidence issue raised by Appellant that depends on the progression of Victim's out-of-court statements and in-court testimony. (*See* Appellant's Post-Sentence Motion, July 15, 2016; Concise Statement, November 23, 2016.) Specifically, Appellant takes issue with the fact that Victim did not immediately identify Appellant as the perpetrator when first responders arrived at the scene or when Victim was first questioned by police, but later identified Appellant from the photo array and in open court. *See id.* However, Appellant, as well as Detective Leeds, credibly explained this "inconsistency" of identification. *See* Trial Ct. Tr. at 51-52, 64-65 (Victim), 93 (Detective Leeds).

The inconsistency of identification in the instant matter was credibly explained, such that Victim risked being labeled a "snitch" by identifying Appellant, which is "a bad thing" in Norristown, and as such would also have hurt Victim's marijuana business in the area. *See* Trial Ct. Tr. at 51-52, 64-65

8

(Victim), 93 (Detective Leeds). Victim was also understandably fearful of explaining to police his familiarity with the area of Norristown where the shooting occurred and Appellant's identity, as both related to Victim's drug business. *See id.* at 60. Victim testified that he ultimately identified Appellant in the subsequent photo array because the risk of *not* identifying Appellant outweighed that of being labeled a "snitch," such that Appellant remained at-large and could be a danger to Victim or his family. *See id.* at 53-54. Corporal Gergel testified he did not remember asking Victim directly for an identification of the perpetrator at the scene of the shooting, but rather asked other preliminary questions, *e.g.*, what had occurred, with the goal of controlling the scene and directing other officers. *See id.* at 17, 20, 23:16-23, 24:14-16. In fact, Victim nevertheless gave a limited description of Appellant when first questioned by Corporal Gergel at the scene. *Id.* at 17. Thus, Victim's testimony, as well as Detective Leeds' and Corporal Gergel's, credibly provided legitimate reasons for Victim's failure to affirmatively identify Appellant initially to the police.

In *Lofton*, there were completely contradictory statements as to the defendant's identification that undermined the witnesses' credibility; whereas, in the instant matter, the inconsistency as to Appellant's identification was an omission, not a direct contradiction. *See Lofton*, 57 A.3d at 1275. Victim's initial omission of Appellant's identification does not undermine credibility to as great of an extent as did the direct contradictions of the witnesses' identifications in *Lofton*. *See id.* at 1272 (witnesses reneged initial identification of defendant.) Here, there were legitimate explanations for Victim's omission, and his later identification of Appellant was not contradictory to his initial limited description to police. *See* Trial Ct. Tr. at 17-18 (Corporal Gergel), 51-54, 64-65 (Victim). Specifically, while Victim did not originally identify Appellant, he was not necessarily asked for a direct identification by Corporal Gergel, and subsequently did not identify Appellant during his first questioning by police so as not to be labeled a snitch. *See id.* at 17, 20, 23:16-23, 24:14-16, 51-52, 64-65. Further, here Victim was not under arrest or incarcerated at the time he identified Appellant, unlike in *Lofton*, where both identifying witnesses were being held and may have cooperated with law enforcement in order to get favorable treatment. *See*

9

*Lofton*, 57 A.3d at 1275. In fact, Victim risked being arrested by identifying Appellant because it necessarily required him to reveal his marijuana business. *See* Trial Ct. Tr. at 60. The undersigned in the instant matter was clearly apprised of the inconsistency of identification and much like the jury in *Lofton* was ultimately free to make credibility determinations. *See Lofton* at 1275. Victim's explanation for the inconsistency of identification in the present matter was credible, and the trial court was within its discretion as the fact finder to believe such testimony. *See, e.g., Cousar, Hunter, supra.*

As in *Lofton*, here there was also corroborating testimony regarding the limited description of the perpetrator, which ultimately matched the actual perpetrator's identity. *See Lofton, supra. Compare* Trial Ct. Tr. at 54-55 (Victim) and 68-70 (Danielle Hawkins) (Victim's and Daniel Hawkins' testimony is not contradictory). Namely, Danielle Hawkins saw two men running down her street around the time and in the area of the shooting, and stated they were both wearing hoodies and one, a hat. *See* Trial Ct. Tr. at 68-70. Victim initially told Corporal Gergel the two men were young black males wearing hoodies and one had a fur hat. *Id.* at 18. Victim's direct identification of Appellant does not contradict these initial, limited statements of identification. Additionally, Danielle Hawkins' and Victim's initial, limited physical description of the men, namely the height, weight, and clothing descriptions, matched that of Appellant. *See id.* at 54-55, 60 (Victim) 68-70 (Danielle Hawkins). Thus, the trial court is well within its discretion to believe certain testimony and assign it a certain weight, as the jury did in *Lofton*.[3]

---

[3] The Supreme Court of Pennsylvania "presumes judges of this Commonwealth are honorable, fair, and competent and, when confronted with recusal demand, have ability to determine whether they can rule impartially and without prejudice." *Commonwealth v. Druce*, 848 A.2d 104, 108 (Pa. 2004) (internal quotation and citation omitted). Specifically, "[w]here a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion." *Commonwealth v. Tedford*, 960 A.2d 1, 55 (Pa. 2008)). While the discretionary question of recusal is not an issue in the instant case, the undersigned was likewise "honorable, fair, and competent" to determine the discretionary questions of credibility and weight of evidence at a bench trial, especially given "a trial court's denial of a motion for a new trial based on a weight of the evidence claim is the *least* assailable of its rulings." *See Cousar*, 928 A.2d at 1036 (emphasis added).

10

The additional evidence, including the sequential photographic array prepared by Detective Leeds from which Victim identified Appellant; Victim's recognition of Appellant's particular accent; and Victim's recollection of Appellant's bottom gold teeth, was compelling in its implication of Appellant as the shooter. The photo array was carefully crafted and presented to Victim, after which his second statement to police and his first direct identification of Appellant followed. *See* Trial Ct. Tr. at 53, 74-75. Detective Leeds created the eight (8)-person array by using a database of photos from offenders throughout the Commonwealth of Pennsylvania, specifically searching persons with similar physical features, age, and race as that of Appellant. *Id.* at 74. The trial court noted the photo array's particular reliability on the record, as follows:

THE COURT: [...] [O]ne of the things I find most compelling in this case is Commonwealth Exhibit 6, which was the photo array. It was a particularly good photo array in that the individuals in each of the photographs looked very similar. And if this was a matter in which the [V]ictim [...] didn't know the [Appellant] and didn't know him from before this incident, it would have been very easy to confuse the picture of [Appellant], which is indicated by a four at the bottom, with the picture that is indicated with a three at the bottom. They look incredibly similar. But that's not what he did. [...]

[T]he fact that he picked out the [Appellant] from this photo array gives his testimony additional credibility.

*Id.* at 120. Prior to presenting this photo array to Victim, Detective Leeds read an instruction form to Victim and had him sign it, which set forth the parameters and procedure of the photo array. *Id.* at 74. The photo array was then handed upside-down to Victim, who was further instructed to look at each photo, even if he saw someone he recognized, before making any identification. *Id.* at 76-77. Victim chose Appellant's picture as the person who shot him. *Id.* at 77. Victim had recognized Appellant since the day of the incident, in part, by his bottom gold teeth. *Id.* at 34, 40. Detective Leeds confirmed Appellant had bottom gold teeth at the time of arrest, and Appellant admitted to having such at the time of

11

the shooting. *See id.* at 92:12-15, 101 (Detective Leeds), 107 (Appellant). Victim also testified he recognized Appellant at the time of the incident by his voice, describing it as not deriving from the Norristown area. *Id.* at 40:14-23. Detective Leeds testified Appellant indeed spoke with an accent unfamiliar to Norristown that resembled a "southern drawl." *Id.* at 92:18-20. Thus, the trial court was within its discretion as the fact finder to give more weight to this additional identification evidence, and ultimately determine Appellant's guilty verdict was not against the weight of all the evidence.

Appellant's testimony, on the contrary, was highly incredible, specifically that regarding the cell phone messages between him and his girlfriend, Satin Williams, which implicated Appellant as the shooter. *See id.* at 107. The text messages referred to a "strizzy," that is, a .40 caliber handgun, and the purchase of a "new clip" or magazine, and "2 box [sic] of bullets." *Id.* at 85-91. When asked about these text messages on direct examination, Appellant gave the following testimony:

> A: That was my phone, but that wasn't me texting and that wasn't Satin that was being texted. Satin's phone number is saved in my phone.
>
> Q: So someone else took your phone and texted --
>
> A: Somebody else --
>
> Q: -- someone else about guns?
>
> A I allowed someone to use my phone. They didn't have a phone.

*Id.* at 107:10-20. The trial court was within its discretion to disbelieve Appellant's explanation for the texts, to infer from this circumstantial evidence that Appellant had the handgun described in the texts during the shooting of Victim on October 3, 2015, and ultimately to find Appellant's guilty conviction was not against the weight of all the evidence.

Given there was ample testimony that credibly explained Victim's hesitation to initially identify Appellant directly to police; matching descriptions given by Victim and the witness, Danielle Hawkins, both in- and out-of-court; and strong corroborating evidence identifying Appellant as the shooter, the trial court was within its discretion in finding that Appellant's guilty verdict was not against the weight of all

12

the evidence. Victim testified he did not want to be labeled a snitch. Both Victim and Detective Leeds testified that being labeled a snitch is undesirable in Norristown. Common sense tells one that the label of snitch typically has a negative connotation anywhere, much like the specific verbiage of elementary school days: "tattletale". *See* Merriam Webster Dictionary (2017), *available at* https://www.merriam-webster.com/dictionary/tattletale.

Victim's initial, limited description of Appellant to Corporal Gergel and eventual direct identification of Appellant in a photo array are corroborated by Danielle Hawkins' description of the clothing and approximate height and weight of the Appellant. Moreover, Victim's initial, limited descriptions are not contradictory to the direct identification of Appellant, and they match Appellant's actual identity, *i.e.*, race, height, weight, gold bottom teeth, and accent.

Victim was credible because his testimony was logical, corroborated by Detective Leeds and Danielle Hawkins, and included an admission of a crime, *i.e.*, selling marijuana. Danielle Hawkins was credible because she did not give more than what she remembered or witnessed, either initially to police out-of-court or during her in-court testimony; she simply described clothing and physical characteristics. *See* Trial Ct. Tr. at 68-70 (Danielle Hawkins testified that at the time she was questioned by police she was not aware of the actual identities of the men or their relative ages). Detective Leeds and Corporal Gergel were credible because each has experience in their respective fields, and their testimony was logical and consistent throughout direct- and cross-examination. *See, e.g., id.* at 13 (Corporal Gergel's qualifications), 71-72 (Detective Leeds' qualifications).

Finally, Victim ultimately made two good identifications of Appellant, once on October 15, 2015, a couple weeks after the incident in the carefully crafted photo array and a second time in-court during the April 20, 2016, bench trial. *See id.* at 39:2-10, 66, 74-75, 78. Therefore, the weight of evidence indicated Appellant was guilty beyond a reasonable doubt, and the trial court did not abuse its discretion or deny Appellant justice when it declined to hold him a new trial. Appellant is merely unsatisfied with the outcome of the case.

13

# CONCLUSION

Wherefore, the reasons stated above, the trial court's final decision was proper and should be affirmed.

BY THE COURT:

**GAIL A. WEILHEIMER,**       **J.**

**Copy mailed on January ⅰ, 2017 to:**
Superior Court Prothonotary
Seth E. Grant, Esq. (PD's Office)
Raymond Roberts, Esq. (DA's Office)
Defendant, Sage Kent, SCI-Brenner Twnshp., # MQ-2237

14